# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JAVANCE MICKEY WILSON,
Defendant and Appellant.

S118775

San Bernardino County Superior Court
FVA-012968

_____

August 5, 2024

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Groban, and Jenkins concurred.

Justice Evans filed a dissenting opinion, in which Justice Liu concurred.

_____

PEOPLE v. WILSON

S118775

Opinion of the Court by Kruger, J.

Defendant Javance Mickey Wilson was charged with robbing and murdering or attempting to murder three cab drivers on separate occasions over a four-week period.  At Wilson's first trial, the jury deadlocked on guilt and the court declared a mistrial.  On retrial, Wilson was convicted of robbery, carjacking, and attempted murder of James Richards; first degree murder and robbery of Andres Dominguez; and first degree murder and attempted robbery of Victor Henderson. (Pen. Code, §§ 187, subd. (a), 211, 215, subd. (a), 664.)  The jury also found that Wilson personally used a firearm in committing the crimes against Richards (*id.*, § 12022.53, subd. (b)), and personally and intentionally discharged a firearm causing the deaths of Dominguez and Henderson (*id.*, § 12022.53, subd. (d)). The jury found true the special circumstances of robbery murder and multiple murder.  (*Id.*, § 190.2, subd. (a)(3), (17).)  At the penalty phase, the jury returned a death verdict and the trial court entered a judgment of death.  This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm the judgment.

1

## I.  FACTUAL BACKGROUND

### A.  Guilt Phase

#### 1.  *Prosecution evidence*

The prosecution presented evidence that in early 2000, Wilson committed a series of crimes against cab drivers in the San Bernardino and Los Angeles areas.  On each occasion, the perpetrator called for a cab, then robbed and murdered or attempted to rob and murder the cab driver.  The first victim, James Richards, was robbed at gunpoint at the end of a rural road in San Bernardino County.  The perpetrator attempted to kill Richards, but the gun jammed and Richards managed to escape.  The second victim, Andres Dominguez, was shot and killed in the same location several weeks later.  The perpetrator then used Dominguez's cell phone to request another taxicab from a Pomona company.  The driver of the cab that responded, Victor Henderson, was the third victim; he was killed approximately two hours after Dominguez, shot by the same gun used to kill Dominguez.

James Richards picked up a passenger in front of a grocery store in downtown San Bernardino on January 7, 2000.  The passenger was going to Bloomington, about 20 minutes away.  After reaching Bloomington, the passenger directed Richards to stop on a rural, dimly lit road.  There, the passenger drew a gun and robbed Richards.  Then, forcing Richards out of the cab and onto his knees, the passenger put the gun into Richards's mouth and tried to shoot him.  The gun jammed, however, and Richards was able to escape to a nearby house.  The owner of the house heard Richards screaming and pounding on his door and saw a figure in the street pointing a gun at Richards before getting into

a cab and speeding off. The cab company later recovered Richards's stolen taxi from an apartment complex in Victorville.

When police arrived at the scene, Richards told them the perpetrator was a Black male in his 30s, with short hair and pock-marked skin, about six feet tall and 220 pounds, and wearing a light-colored ski jacket. Although Wilson was 25 at the time, Richards's description generally matched Wilson's appearance. Richards later identified Wilson from a photo lineup but was unable to pick Wilson out of a live lineup held two weeks after the initial identification. Richards described the weapon Wilson used as a smaller, chrome gun. Police later recovered a .22 handgun fitting this description from a friend of Wilson's, as part of their investigation into the crime.

The prosecution presented additional evidence to connect Wilson to the weapon used in the Richards robbery and to related events and locations. Joe Diaz testified that on January 6, 2000, intruders broke into his house and took everything from his gun case, including a hunting rifle and a .22 handgun that jammed nearly every time it was shot. A childhood friend of Wilson's purchased that hunting rifle from Wilson in January or February 2000. The same friend testified that Wilson's grandparents lived in Bloomington, not far from the road where Richards had been robbed, and that Wilson had lived with his grandparents periodically. In an interview with detectives, Wilson admitted having access to a small .22 pistol. At the time of the robbery, Wilson lived in an apartment in Victorville about two miles from Diaz's home and one street away from the location where the cab company recovered Richards's stolen taxicab. It was about 40 miles from Victorville to San Bernardino, but in January 2000, Wilson's mother had been staying in a motel right by the grocery store in San Bernardino

where Richards picked up his assailant; the manager of the motel testified that Wilson and his brother Sylvester Seeney visited her there on January 6 or 7.

Andres Dominguez drove his cab to pick up a passenger at a San Bernardino grocery store just before midnight on February 20, 2000. Soon afterwards, Dominguez was shot and killed on the same road where Richards had been robbed. A resident who heard the gunfire saw a car leaving the scene, while Dominguez's taxicab remained on the street.

Later that night, a caller used Dominguez's cell phone to request a taxi from a Pomona cab company. Victor Henderson picked up the passenger. At approximately 2:30 a.m., Henderson was shot and killed a distance from his cab. Eyewitnesses saw a man in a white ski jacket running in the street where Henderson had been shot. The man then got into a car that drove away before he was fully inside, dragging him briefly.

Sara Bancroft and Christina Murphy saw Wilson the day before the murders and the morning after; each testified that after the murders, Wilson had an injured leg and was complaining about scuffs on his new sneakers that had not been present the day before. A friend of Bancroft's, Tiffany Hooper, also saw Wilson the morning after the murders and noticed his injury.

Bancroft was a neighbor of Wilson's in Victorville who knew Wilson and his younger brother Seeney. She rented a car for Wilson to use on February 20 and 21. She saw Wilson on the evening of February 20. He was with an 18- or 19-year-old man she did not recognize. The next morning when Wilson came back with the rental car, he was with a different man and there

was something wrong with his knee. He was limping and could not bend his leg well. Bancroft and Hooper gave Wilson and the man a ride to San Bernardino before returning the rental car. Hooper later identified the second man as Cory McKinney. Hooper said that Wilson was limping badly and that there was a white ski jacket and a cell phone in the back seat of the car.

Murphy met Wilson on February 19 and he stayed with her in San Bernardino until about 3:00 a.m. on February 20. She saw him later that day and again the next morning. Although he had not been previously injured, on the morning of February 21, Wilson was limping, his leg was wrapped and a little bloody, and his pant leg was torn. Wilson came to her house with Cory McKinney's brother Brad McKinney, who asked if she had seen the news. She had not. Wilson asked her sometime after that what she would think if she found out he shot someone.

Criminalists determined that Dominguez and Henderson were killed by the same weapon. The investigation later revealed the weapon was a .44 revolver stolen from Grant Fargon on February 15, 2000. Fargon lived a half mile from Wilson's apartment in Victorville. His entire gun collection — including the .44 revolver, guns that had been painted in camouflage for hunting, and other specialized weapons — had been taken in the February 15 burglary.

Phyllis Woodruff, the girlfriend of Wilson's brother Seeney, testified that shortly before the murders she saw Wilson with a large collection of guns on his bed, including camouflaged guns. Wilson had been showing off a long black gun that looked like the .44 revolver later identified as the murder weapon. Woodruff acknowledged that she participated in burglarizing

some of the homes from which the weapons were taken, serving as the driver while Wilson, Seeney, and Brad McKinney went inside. She was given immunity from prosecution for those crimes. Woodruff testified that she and Seeney were at her family's barbeque on February 20, and that Wilson stopped by with Brad McKinney and borrowed Seeney's white ski jacket.

Woodruff also knew about the Richards robbery. She testified that on January 7, 2000, she was with Seeney and Wilson when they visited their mother at her motel in San Bernardino. Wilson stayed in San Bernardino after Woodruff and Seeney left. Later, back at the apartment Wilson shared with Seeney in Victorville, Wilson told them that he had robbed a cab driver, described his gun jamming when he tried to shoot the driver, and took them to see the taxicab he had stolen and abandoned in a nearby apartment complex. Woodruff said that Wilson gave the malfunctioning gun to Brad McKinney. Police later recovered the .22 handgun stolen in the January 6 break-in of Joe Diaz from the house where Brad and Cory McKinney stayed in San Bernardino.

Woodruff's father, Henry Woodruff, described the family barbeque at his house on February 20. Wilson stopped by the barbeque and while there, took the white ski jacket Seeney had been wearing and began wearing it himself. Henry Woodruff recalled that Seeney and Phyllis stayed at the Woodruff house that night. Phyllis and Henry Woodruff's wife also told detectives that Seeney was at the Woodruff home that night, which was the night of the murders.

In a statement to police, Wilson admitted using Dominguez's cell phone, but claimed that he borrowed it from a

friend and had not known the phone belonged to a murder victim.

Seeney invoked his Fifth Amendment privilege to avoid testifying; his preliminary hearing testimony was instead read to the jury at both the trial and retrial. During the preliminary hearing, Seeney had testified under a grant of immunity and acknowledged that he had been committing burglaries with Wilson and Woodruff in the period shortly before the murders. In his testimony, Seeney said that Wilson had talked about his plan to rob cab drivers and that he later told Seeney that he hit the first driver in the head with the gun after it jammed. Like Phyllis Woodruff, Seeney said that Wilson showed him stolen items and the abandoned cab from the January 7 robbery, and that Wilson gave the malfunctioning gun to Brad McKinney. Seeney testified that Wilson had been showing off a .44 revolver before the murders and that Wilson borrowed Seeney's white ski jacket at the Woodruff barbeque on February 20. Seeney acknowledged that Wilson told him about killing two cab drivers; Wilson said he was dragged by the car during one of the robberies and scraped his shoes. Seeney also described being present when Wilson confessed the murders to his common law wife. They were with Wilson's wife in her big rig when she got a call from her dispatcher connecting her to a police detective. When she confronted Wilson and asked whether he killed the cab drivers, Wilson admitted that he had.

### 2. *Defense evidence*

The defense presented evidence to suggest that Seeney, Brad McKinney, Cory McKinney, or another third party, could have been responsible for the crimes. One of the detectives who interviewed Phyllis Woodruff testified that she said there were

many nights when she had no idea where Seeney was, though the detective clarified during cross-examination that Phyllis had been very precise about where Seeney was the night of the murders. The sergeant responsible for the investigation testified that Cory McKinney gave three different false alibis for the night and early morning of the murders, and that Cory and Brad McKinney both remained suspects in the case. The defense called law enforcement investigators to suggest that some of the evidence that might have shown the involvement of perpetrators other than Wilson had not been carefully examined or tested. In particular, the defense emphasized a shoe found in the street some distance from the Pomona crime scene, and hair, fiber, and fingerprint evidence that might have been, but was not, collected and examined.

Much of the defense case focused on undermining Richards's identification of Wilson as his attacker. An eyewitness identification expert explained how eyewitness memory can be influenced and testified about several factors suggesting that Richards's identification of Wilson might not be accurate. These factors included the possibility that Richards had seen a "wanted" poster with Wilson's photograph on it before making his identification; that Richards could not identify Wilson in a live lineup; that the detective administering the photo lineup may have prompted Richards to select Wilson's photo by asking about "number five," Wilson's position in the lineup; that the detective might have improperly showed Richards another lineup with Wilson's photograph before Richards made his identification; and that Richards at one point thought that someone who did not look much like Wilson could have been his attacker. The defense also presented evidence that Richards robbed a cigarette store in November 2000. The

defense tried to establish that Richards was getting preferential treatment on his robbery case in exchange for his testimony against Wilson. Presenting evidence that Richards's preliminary hearing had been repeatedly continued and the prosecutor had not spoken to any witnesses, the defense suggested that prosecutors were not actively pursuing the case against Richards.

### B. Penalty Phase

The prosecution presented aggravating evidence that included Wilson's admission of guilt for the voluntary manslaughter of an individual with whom he had a drug sale transaction, assault of an individual whom he had threatened to kill, and threats to a courtroom deputy during the retrial. Several witnesses related to Dominguez and Henderson provided victim impact testimony.

In mitigation, Wilson presented evidence of his mother's mental illness and substance use, and the learning disabilities, brain damage, and behavioral problems he experienced that were related to or exacerbated by being physically abused and neglected during his chaotic childhood.

## II.   DISCUSSION

### A. Richards's Identification

Wilson raises several challenges to the trial court's decision to admit evidence that Richards, the victim of the first robbery and attempted murder, identified Wilson from a photographic lineup and identified him in court during the preliminary hearing. We reject each of his arguments.

## 1. *Background*

As noted, the night of the robbery, Richards gave police a description of the perpetrator that was roughly consistent with Wilson's appearance. After the robbery, however, Richards began to suspect that a man he met in a drug rehabilitation program, Ray Bradford, could be the man who robbed him. Bradford's appearance was notably different from Wilson's; at five feet nine inches, Bradford was shorter, darker skinned, and had a thinner face. The police did not find reason to suspect Bradford. Instead, they showed Richards a photo lineup (not including Wilson) with the picture of a different suspect. Richards did not identify anyone in the lineup. By late February or March, police suspected Wilson. In early March, Detective Scott Franks showed Richards a photo lineup that contained Wilson's photo. Franks provided a standard admonishment that the lineup might not contain a picture of the suspect, that hairstyles and facial hair might have changed, and that the complexion of the person could be lighter or darker than depicted in the photograph. Richards selected Wilson's photograph, drawing a circle around the photo and stating that Wilson's picture looked "exactly like the guy" and "jumped right out at me." Several days afterwards, however, when officers held a live lineup including Wilson, Richards did not identify him. In the photograph Richards had identified, Wilson wore a mustache and soul patch; in the live lineup he wore a beard.

Shortly before the preliminary hearing, Richards met with the prosecutor in the hallway outside the courtroom. The prosecutor showed Richards a variety of photographs and documents, including a copy of the photographic lineup on which Richards had circled Wilson's picture. At some point during the hallway meeting, the prosecutor asked Richards whether he

thought he would be able to identify Wilson in the courtroom and Richards was not sure. During the preliminary hearing, Richards identified Wilson in court as he sat at the defense table in a red jail jumpsuit.

The defense moved to exclude both the photo and in-court identifications. Defense counsel argued that the requirements of *People v. Kelly* (1976) 17 Cal.3d 24, governing the admission of evidence based on a new scientific method, should apply in deciding whether the photo lineup and in-court identification procedures were sufficient to ensure the reliability of Richards's identification. Counsel argued the photo lineup from which Richards identified Wilson did not comply with accepted scientific methods for two reasons: (1) administration of the lineup was not "blind" because the detective presenting the lineup knew that Wilson was the suspect and might have inadvertently provided Richards with subtle cues to select Wilson's photograph; and (2) allowing Richards to view all six photos in the lineup simultaneously, rather than sequentially, could lead him to make an identification based on the subject who looked most like perpetrator relative to the other photos, instead of by individually comparing each photo to his own memory. Counsel further argued that by showing Richards the photo lineup before his preliminary hearing testimony, the prosecution used a suggestive process to obtain the in-court identification. Counsel argued the identification should be excluded under Evidence Code section 352 and the federal due process clause.

In support of the motion, the defense presented the testimony of Detective Franks, who had conducted the March photographic lineup with Richards. After Detective Franks showed Richards the lineup, the following exchange occurred:

"[Det. Franks]: What are you pointing to? Number five?

"Richards: Yeah.

"[Det. Franks]: What about number five?

"Richards: That looks — that looks exactly like the guy right there.

"[Det. Franks]: Okay. Exactly like him?

"Richards: Yeah.

"[Det. Franks]: Okay. What I want you to do then is — I want you to circle number five. Circle the whole thing, sign it."

Dr. Kathy Pezdek, a memory expert and cognitive psychologist, testified for the defense to describe the relevant empirical research and explain why blind and sequential lineups were considered more reliable. She agreed with counsel that when an administrator gave a cue such as " 'what about No. 5?,' " it might lead the witness to select that photograph, an interference with the witness's memory that blind administration sought to prevent. The defense provided the court a 1998 survey of scientific literature and wrongful convictions from a subcommittee of the American Psychology/Law Society. That group found "impressive" evidence that sequential administration reduces false identifications; its final recommendations included the use of blind administration and a photographic lineup in which the suspect does not stand out. The defense also submitted 1999 findings and guidelines prepared by the United States Department of Justice that were based on 20 years of empirical research and best practices identified by law enforcement agencies across the country. The Department of Justice's recommendations did not include blind administration or a

sequential showing of photographs, but the findings and guidelines noted evidence indicating that those procedures might enhance reliability.

The trial court admitted Richards's identifications. Although the court acknowledged Wilson's evidence concerning preferred methods of conducting a photo lineup, the court did not "find any evidence to support" the conclusion that a lineup without those features was so "impermissibly suggestive as to violate due process." The court also ruled that showing Richards a copy of the lineup before his preliminary hearing testimony and in-court identification was not unduly suggestive. After the first trial ended in mistrial, the parties and trial court agreed to abide by the trial court's previous ruling on the admission of Richards's identification.

The admission of Richards's identification had been based on evidence that Richards saw two lineups, one with Wilson's photo and one without. Later in the trial, however, the defense located a third photo lineup in the prosecution files that included Wilson's photo, and a dispute arose over whether Richards had seen this third lineup. Whether Richards had seen another lineup with Wilson's photograph before making an identification was significant because the defense expert testified that Richards might have "recognize[d]" Wilson in the final lineup only because he had already seen his photograph (without recognizing him) in a previous one. To counter this theory, the prosecution presented evidence that Detective Franks had not shown Richards the third lineup: Richards could not be sure whether he was shown two or three lineups; the sergeant in charge of the investigation had prohibited use of the third lineup; and Detective Franks denied showing the third lineup to Richards.

### 2. Discussion

#### a. Lineup procedures

Wilson argues that the photo lineup shown to Richards was unduly suggestive and that Richards's identification should therefore have been excluded as unreliable. Based on the record before us, we are not persuaded.

The "admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine." (*Perry v. New Hampshire* (2012) 565 U.S. 228, 232 (*Perry*).) There is, however, "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." (*Ibid.*; accord, e.g., *Manson v. Brathwaite* (1977) 432 U.S. 98, 114.) To determine whether the admission of identification evidence violates a defendant's due process rights, the court asks two questions. First, the court asks whether the identification procedure was unduly suggestive and unnecessary. (*People v. Sanchez* (2019) 7 Cal.5th 14, 35.) "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." (*Neil v. Biggers* (1972) 409 U.S. 188, 198.) Second, even if the lineup was unnecessarily suggestive, the court asks whether the identification was nonetheless reliable under the totality of the circumstances. (*Sanchez*, at p. 35.) Exclusion is required if there is "'a very substantial likelihood of irreparable misidentification.'" (*Perry*, at p. 232.) "But if the indicia of reliability are strong enough to outweigh the corrupting effect of

the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." (*Ibid.*; see *Brathwaite*, at p. 114.)

On appeal, we give deference to " 'the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive.' [Citation.] 'Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 902.)

Wilson argues that the photo lineup at issue was unduly suggestive because Detective Franks, aware that Wilson was a suspect in the case, steered Richards toward selecting Wilson. The trial court found no evidence of such steering. Although the record reflects that Detective Franks directed Richards to circle Wilson's photograph, the trial court noted this occurred after — not before — Richards had already selected that photograph. The court was also evidently unpersuaded by Wilson's argument that the detective's question, "What about number five?," prompted Richards's selection. The record supports the trial court's apparent view. During the lineup, Detective Franks asked Richards, "What are you pointing to? Number five?," suggesting that Richards was pointing to the photo before Detective Franks said anything about it. The detective then asked, "What about number five?," apparently to prompt Richards to explain why he had pointed at the photo — not to prompt Richards to select the photo in the first place.

Wilson argues that Detective Franks nonetheless interfered with Richards's identification by directing him to circle the photograph in position number five without giving him additional time to look at the other photos. After Richards said number five looked "exactly like" the perpetrator and Detective Franks told him to circle that photo, Richards stated: "I'm trying to look at everybody else real quick but — he just jumped right out at me." Detective Franks replied, "Okay. Then circle number five." Wilson identifies nothing in the record to suggest that by directing Richards to circle the photograph he had identified, Detective Franks was attempting to lock Richards into an overly hasty identification. And Richards expressed no further need for time before he proceeded to circle the photograph he had spontaneously identified as "jump[ing] right out" and looking "exactly like" the perpetrator.

Wilson suggests that knowing number five was the suspect may have affected Detective Franks's administration of the photo lineup in other ways, causing him to unconsciously provide Richards with cues to select Wilson's photo and affecting the reliability of Richards's identification. (See *State v. Henderson* (N.J. 2011) 27 A.3d 872, 896 (*Henderson*) [describing the " 'expectancy effect' " in which even an administrator's "seemingly innocuous words and subtle cues . . . can influence a witness' behavior"].)

To the extent Wilson argues that any nonblind lineup is inherently suggestive, case law does not support the argument, and we reject it. Wilson cites *Henderson* in support of the argument. But the court in *Henderson* did not hold that a nonblind lineup was unduly suggestive; it instead simply explained that an "ideal" administrator would not know who the suspect is. (*Henderson*, *supra*, 27 A.3d at p. 897.) This court,

likewise, has "never required" that a photographic lineup "be administered in a double blind procedure."[1] (*People v. Lucas* (2014) 60 Cal.4th 153, 237; see also *Com. v. Watson* (Mass. 2009) 915 N.E.2d 1052, 1059 [the absence of a double-blind procedures goes to the weight of identification evidence, not its admissibility]; *State v. Outing* (Conn. 2010) 3 A.3d 1, 16 [failure to use a double-blind procedure, without more, did not render identification unnecessarily suggestive].) We recognize that our Legislature has recently enacted requirements, including blind administration, designed to enhance the reliability of eyewitness identifications. (Pen. Code, § 859.7.) Our inquiry, however, is not whether a practice might enhance reliability, but whether its omission is indicative of a procedure that is unduly suggestive. (Cf. *Lucas*, at p. 237 [declining to equate the absence of "protective measures" such as a nonblind lineup with an unduly suggestive procedure].) Recognizing that "[m]ost eyewitness identifications involve some element of suggestion" (*Perry*, *supra*, 565 U.S. at p. 244), we conclude that the procedure in this case was not "*unduly* suggestive and unnecessary" simply because the lineup was not blind (*People v. Alexander*, *supra*, 49 Cal.4th at p. 902).

Wilson claims the identification procedure in his case was also unduly suggestive because Richards viewed a group of six photographs simultaneously, rather than sequentially. He notes that other jurisdictions have found sequential lineups

---

[1] A "double blind" procedure indicates that the administrator does not know who the suspect is, whereas a "blind" or "blinded" procedure is one in which the administrator knows the identity of the suspect but is not able to see the suspect's position in the lineup. (See *Henderson, supra*, 27 A.3d at p. 896; Pen. Code, § 859.7, subd. (c).)

more reliable than simultaneous ones, citing *Henderson*, *State v. Lawson* (Or. 2012) 291 P.3d 673, and the Department of Justice guidelines presented at trial. The court in *Lawson* found that a witness who views lineup photographs sequentially is "less likely to misidentify innocent suspects" (*Lawson*, at p. 686); the Department of Justice guidelines also noted that sequential lineups produce more reliable evidence. But the Department of Justice found there was not consensus for recommending sequential lineups as a preferred procedure, the American Psychology/Law Society guidelines Wilson presented to the trial court declined to recommend the use of sequential lineups, and the court in *Henderson* similarly concluded that, "[f]or now, there is insufficient, authoritative evidence accepted by scientific experts for a court to make a finding in favor of either procedure." (*Henderson*, *supra*, 27 A.3d at p. 902; see also *U.S. v. Johnson* (7th Cir. 2014) 745 F.3d 227, 229 [noting some research has called into question the superiority of sequential presentation].) Our own Legislature, in enacting requirements designed to enhance the reliability of eyewitness identifications, has not included a preference for sequential procedures, either. (Pen. Code, § 859.7.) In this case we conclude that "there was no undue suggestiveness in the procedures actually employed." (*People v. Lucas*, *supra*, 60 Cal.4th at p. 237.)

Wilson also argues that it was unduly suggestive to show Richards two different lineups containing Wilson's picture. The argument fails because it rests on a factual premise that was never established at trial: that Detective Franks had, in fact, shown Richards the third lineup later discovered in the prosecution's files, even though Detective Franks testified he had not. (Cf. *People v. Thomas* (2012) 54 Cal.4th 908, 932 [when the defendant "merely speculates that [the witness] could have

18

seen [the suspects'] photographs," he has not demonstrated the identification procedure was unduly suggestive].) And because it has not been established that Richards ever saw the third lineup, we reject Wilson's related claim that the third lineup was unduly suggestive because its composition caused him to " ' "stand out" from the others in a way that would suggest the witness should select him.' " (*People v. Wilson* (2021) 11 Cal.5th 259, 284.)

Wilson contends that the lineup Richards *did* see was also unduly suggestive because Wilson was the lightest-skinned subject in the lineup. The record does not support the contention; Wilson's complexion was not obviously lighter than some of the others pictured. Moreover, Detective Franks advised Richards that the photographs might not depict the true complexion of the subject, which "may be lighter or darker than shown in the photo."

Finally, Wilson argues that the trial court did not make a proper determination that the lineup was suggestive and did not apply the correct constitutional standard when admitting that evidence. Wilson emphasizes that in discussing the admissibility of the lineup, the trial court commented that there was not a sufficient showing that the identification was " 'worthless.' " As we have indicated, however, the trial court ruled that the lineup was not so "impermissibly suggestive as to violate due process"; the court also explained its conclusion. At any rate, we independently review the trial court's ruling (*People v. Alexander*, *supra*, 49 Cal.4th at p. 902), and have made our own determination that the identification procedure was not unduly suggestive.

Because the photo lineup used in this case did not involve an unduly suggestive and unnecessary procedure, the resulting identification was admissible into evidence. (*People v. Alexander*, *supra*, 49 Cal.4th at p. 903.) "[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." (*Perry*, *supra*, 565 U.S. at p. 248.) We instead rely on jurors and their ability to " 'measure intelligently the weight of identification testimony.' " (*Alexander*, at p. 903.)

### b. *In-court identification*

Wilson also challenges the admission of Richards's in-court identification of him during the preliminary hearing.

At a hearing on whether to admit the preliminary hearing identification at trial, the prosecutor testified that he met with Richards before the preliminary hearing and showed him a copy of the photo lineup on which Richards had circled Wilson's picture. The prosecutor explained that he wanted to confirm the lineup was the one Richards had seen and bore his signature; it was among other photos and reports the prosecutor reviewed with Richards before his testimony. The prosecutor noted that during their meeting Richards was not sure whether he would be able to identify Wilson in court. In ruling that the identification was admissible, the court observed that the defense would be able to present evidence to demonstrate that during the in-court identification, Wilson was the only person seated at the defense table in jail clothing, and to raise other factors bearing on the reliability of the identification, such as Richards's inability to identify Wilson in a live lineup and

20

Richards's mistaken belief that another man with a different appearance might have been his assailant.

Wilson contends the prosecutor tainted Richards's preliminary hearing identification by showing Richards a copy of the photo lineup. Wilson argues that this was a suggestive pretrial procedure, citing *People v. Contreras* (1993) 17 Cal.App.4th 813. In *Contreras*, the witness failed to identify the defendant in a photographic lineup, was shown an individual photo of the defendant two days before the preliminary hearing, and then identified the defendant in court at the preliminary hearing. (*Id.* at p. 820.) The appellate court found the individual photo showup unduly suggestive. (*Ibid.*) Wilson argues that showing Richards a copy of the photo lineup was similarly suggestive. The court in *Contreras*, however, went on to hold that the witness's in-court identification was admissible because it was based on the witness's "independent recollection" rather than the suggestive photo lineup. (*Id.* at p. 821; see *People v. Ratliff* (1986) 41 Cal.3d 675, 689 [the taint of an unduly suggestive lineup "may be dispelled if the People show by clear and convincing evidence that the identification of the defendant had an independent origin"].)

Here, unlike in *Contreras*, Richards made an in-court identification after viewing a lineup that was not unduly suggestive. Furthermore, the prosecutor showed Richards the lineup, along with other photographs and documents, as part of the general preparation for Richards's testimony; there is no indication in the record that the prosecutor showed Richards the lineup in response to Richards's uncertainty about his ability to identify Wilson in court. But even assuming that seeing the marked-up copy of the lineup could have affected Richards's in-court identification, we conclude that, as in *Contreras*, the in-

court identification was nonetheless admissible because the record indicates the identification was based on Richards's independent recollection. Richards explained during his trial testimony that he recognized Wilson in the preliminary hearing when Wilson looked up at him with a distinctive smirk, the "same exact expression that he had when the gun didn't go off in my mouth." The prosecutor also asked Richards about being shown Wilson's photo lineup just before the preliminary hearing, and although Richards did not think it affected him, the jurors were free to conclude otherwise. And as the trial court noted, the defense was able to present evidence to challenge the reliability of the in-court identification. As in *Ratliff*, where we ruled the "defendant could raise and argue the issue of suggestiveness despite [the witness's] independent recollection," the "procedure did not deprive [Wilson] of due process or a fair trial." (*People v. Ratliff, supra*, 41 Cal.3d at p. 689.)

Wilson argues that before allowing Richards's in-court identification, the trial court should have placed the burden on the prosecution to show that Richards had personal knowledge of Wilson's appearance and that Richards's opinion that Wilson was his attacker was rationally based on his perception.

In urging us to adopt this approach and hold that the trial court should have undertaken this inquiry, Wilson now relies heavily on the Oregon Supreme Court's decision in *State v. Lawson, supra*, 291 P.3d 673, which sets out foundational requirements for admission of identification testimony under Oregon statutory law. We have no occasion to address the argument because Wilson did not raise it in the trial court. It has therefore been forfeited.

22

What Wilson did request was for the trial court to exclude Richards's identification under Evidence Code section 352, arguing that it had limited probative value.  The trial court did not abuse its discretion in denying this request.  Richards's testimony was clearly relevant and probative, reflecting his personal observations made over the course of the crime, and there was no showing of undue prejudice.  (See *People v. Nadey* (2024) 16 Cal.5th 102, 152 ["The fact that evidence, or an inference drawn therefrom, is harmful to the defendant's case does not mean the evidence is unfairly prejudicial" under section 352].)  As previously noted, Richards testified that he was looking directly at Wilson's face when the gun Wilson tried to shoot him with jammed:  he said that Wilson was "kind of smiling," with a " 'Damn, you got lucky' type" of look.  Richards said he later identified Wilson in the photo lineup and in court by the same expression, a "very distinctive" smirk.  Wilson has not, in short, established a basis for overturning the trial court's decision to admit the identification.

### c.  *Eyewitness identification instructions*

Wilson claims that the trial court erred in instructing the jury with CALJIC No. 2.92, which directs jurors to "consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification," including "[t]he extent to which the witness is either certain or uncertain of the identification."  Wilson argues the instruction violated his federal and state due process rights.[2]

---

[2]  The Attorney General contends that Wilson has forfeited any argument that the instruction should have been modified, citing *People v. Sanchez* (2016) 63 Cal.4th 411, 461, in which we

During his testimony for the prosecution at trial, Richards again identified Wilson in the courtroom, stated that he was "[v]ery certain" of his identification, and explained that Wilson had a distinctive "smirk smile" that he recognized. The defense presented several case-specific reasons to distrust Richards's identification; the defense eyewitness identification expert reiterated these case-specific points, and described other, more general circumstances that rendered Richards's identification unreliable. Regarding Richards's profession of certainty, the expert explained why eyewitness confidence, in general, "is very easy to manipulate." Witnesses who may have been uncertain about an identification will become more confident with positive feedback that they have selected the right person, even though nothing has changed to affect the accuracy of the identification.

The jury instructions included CALJIC No. 2.92, which listed 12 factors to consider when assessing the accuracy of an eyewitness identification, including the "extent to which the witness is either certain or uncertain of the identification."[3] The

_____

concluded the defendant forfeited a challenge to CALJIC No. 2.92 by failing to request that the instruction be modified. Here, Wilson's claim is that the instruction was an incorrect statement of law and deprived him of due process. In such circumstances, the "failure to request clarification or amplification of the instruction at issue does not result in a forfeiture of his challenge." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011; see also *People v. Mitchell* (2019) 7 Cal.5th 561, 579–580 [failure to object does not result in forfeiture of a claim that an instruction violated due process or other substantial rights]; Pen. Code, § 1259.)

[3] The trial court introduced the factors by stating: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the

trial court also instructed the jury on factors to consider in determining the believability of witnesses generally and in weighing expert testimony.  In closing, the defense noted that Richards expressed certainty in his identification in court, but emphasized reasons the defense had offered to question whether Richards was correct "even though he really believes it."  In response, the prosecutor acknowledged that if "we had nothing but the Richards I.D." then "absolutely I would concede that it is a very precarious identification."  The prosecutor referred to Richards as a "weak or a susceptible witness" but argued that evidence independently linking Wilson to the crime corroborated and therefore strengthened Richards's identification testimony.

To evaluate Wilson's claim that the jury instruction resulted in the deprivation of federal due process, we consider the instruction in the context of the trial record and the instructions as a whole to determine whether the instruction " ' "so infuse[d] the trial with unfairness as to deny due process of law." ' "  (*People v. Lemcke* (2021) 11 Cal.5th 644, 655 (*Lemcke*).)  In *Lemcke*, we explained that a similar reference to eyewitness certainty in CALCRIM No. 315 was " 'superficially neutral,' " in that it does not direct jurors to presume an identification is accurate if the eyewitness has expressed certainty, but we recognized that the certainty language had the potential to mislead jurors because it reinforced the common misconception that certainty is related to greater accuracy.

crimes charged.  In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following."

(*Lemcke*, at p. 657.) We held, however, that the instruction did not violate the defendant's due process rights, either by lowering the prosecutor's burden of proof or by denying a meaningful opportunity to present a complete defense on the issue of identity. Although the defendant's conviction "was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant" (*id.* at p. 666), the defendant was able to put on a "vigorous defense on the issue of identity" (*id.* at p. 660). He had an eyewitness identification expert testify about the weak correlation between certainty and accuracy, he cross-examined the eyewitness about inconsistencies in her identification and account of the crime and cross-examined investigating officers about potentially suggestive procedures used during initial identifications. (*Ibid.*) Given that, and the other instructions the jury received about evaluating the evidence, we concluded that "listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id.* at p. 661.)

Wilson argues that *Lemcke* is not controlling here because he is raising a different claim: Rather than arguing that the instruction lowered the prosecution's burden of proof or interfered with the ability to present a defense on identity, he is arguing that the instruction "materially impair[ed] the jury's ability to accurately find facts regarding an identification's reliability." Another reason is that this case, in Wilson's view, involves a different set of circumstances from *Lemcke*. Wilson contends that because Richards testified that he was "[v]ery certain" when he identified Wilson in court, there was a risk the

jury would infer accuracy from Richards's certainty; that the eyewitness identification was a critical component of the prosecution case; and that Richards's certainty was tainted by suggestive identification procedures.

We are not convinced that this case calls for a different analysis or result from *Lemcke*. The claim Wilson now raises, about the interference with the jury's consideration of the issue of identity, arises from substantially similar circumstances as *Lemcke*, which likewise involved an eyewitness who testified as to the certainty of her identification despite circumstances giving rise to reasonable questions, and it rests on the same core argument as the claims we considered in *Lemcke*: that the certainty language in the eyewitness instruction created a risk that jurors would "infer that certainty is generally correlative of accuracy." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) And, as in *Lemcke*, Wilson "was permitted to present" a substantial case "to combat that inference." (*Id*. at p. 658.) The defense in Wilson's case vigorously challenged Richards's identification, directly challenged the discrepancy between Richards's expressed certainty and evidence that he had difficulty making an identification, and presented expert testimony explaining why eyewitness confidence is not the same as accuracy. As a result, the prosecutor acknowledged that Richards's identification standing alone was weak but gained strength from corroborating evidence. Contrary to Wilson's suggestion, this corroborating evidence was substantial and was not limited to testimony from Seeney and his girlfriend, whose motives the defense questioned. The evidence included, for instance, Wilson's connection to the firearm used in the robbery and attempted murder of Richards. Further, as in *Lemcke*, the jury received standard instructions on how to evaluate and weigh the

27

evidence. (See *id.* at p. 658.) We therefore are not persuaded that CALJIC No. 2.92 interfered with the jury's ability to assess the reliability of Richards's identification, much less infused the trial with such unfairness that it violated Wilson's federal due process rights.

Wilson argues in the alternative that the instruction violated his state due process rights. As we have repeatedly recognized, the state Constitution affords independent protection from the federal Constitution. (See *People v. Ramos* (1984) 37 Cal.3d 136, 153 [invalidating the so-called Briggs Instruction in capital cases as "seriously misleading" and inconsistent with the fundamental fairness guaranteed by the state due process clause; disagreeing with the contrary holding of the United States Supreme Court under the federal due process clause].) Here, however, "listing the witness's level of certainty as one of [12] factors the jury should consider when evaluating an eyewitness identification" did not render Wilson's trial "fundamentally unfair" under either the state or the federal Constitution. (*Lemcke, supra*, 11 Cal.5th at p. 661.) To the extent that Wilson also asserts that the instruction was a violation of state law that did not rise to the level of constitutional error, he has not established it was "reasonably probable that the jury here was misled to [his] detriment." (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) As indicated, the prosecutor acknowledged that the defense succeeded in significantly undermining Richards's identification and urged the jury to convict Wilson on the basis of other evidence of his guilt that corroborated Richards's identification. It is not reasonably probable that the instruction caused jurors to rely instead on Richards's expression of certainty in reaching their verdict.

### B. Identification Impeachment

As we have discussed, the defense questioned the reliability of Richards's identification by presenting evidence that Richards may have viewed three photo lineups: one that did not contain Wilson's photo; a second from which Richards selected Wilson's photo; and a third, later found in the prosecution files, that also contained Wilson's photo. The defense theorized that the third photo lineup could have been shown to Richards before he saw the lineup from which he identified Wilson. As noted, however, Detective Franks testified that he never showed Richards the third photo lineup found in the prosecution's files. During the first trial, the defense attempted to impeach Detective Franks by presenting evidence of two work-related incidents involving dishonesty. At the retrial, however, the trial court excluded that impeachment evidence under Evidence Code section 352. Wilson claims the ruling excluding the impeachment evidence was an abuse of discretion and a violation of his constitutional rights. Ultimately, we do not need to resolve this issue because any error was harmless beyond a reasonable doubt.

#### 1. Background

In an interview with a defense investigator less than two weeks after he identified Wilson in a photo lineup, Richards explained that detectives showed him one lineup and, a couple of days later, came back and showed him a second set of pictures; he confirmed that he identified Wilson's photograph in the second lineup. During the preliminary hearing several months later and again in the first trial, Richards testified that he believed he viewed three photo lineups and did not identify anyone during the first two, though he also expressed some uncertainty about whether there were two or three lineups. In

its opposition to the motion to exclude Richards's identifications, the prosecution stated that Richards identified Wilson "at the third of three photo lineups that law enforcement showed to him" and the defense later found a third photo lineup in the prosecution files. The third lineup included Wilson's photograph but was not the same as the lineup from which Richards had made his identification. The defense introduced the third, late-discovered lineup into evidence as Exhibit 147.

In the first trial, the defense called Detective Franks to describe administering the photo lineup to Richards. Detective Franks did not take part in the first photo lineup, from which no identification was made. Detective Franks went alone to Richards's home to show him the second photo lineup, from which Richards identified Wilson. Detective Franks testified that he never showed Exhibit 147, the third photo lineup, to Richards because the supervising sergeant did not think it was a fair lineup.

During his testimony, the defense confronted Detective Franks with statements he made about administering the lineup that were later shown to be inaccurate. For example, in a prior proceeding Detective Franks said that he told Richards to take his time making his identification and denied commenting on position number five (Wilson's position). In a tape recording of the lineup, however, Detective Franks did not tell Richards to take his time and mentioned position number five multiple times, asking Richards if he was pointing to number five, for example, and telling him to circle number five after selecting it. The defense also asked Detective Franks about two instances of misconduct that had occurred in the previous year. Regarding the first incident, Detective Franks admitted that he had falsely claimed to be a detective from a

different police department to gain access to a private home and, once found out, lied to detectives from the other jurisdiction about his reasons for doing so. Detective Franks also admitted to a second incident in which he violated department rules by moonlighting as a security guard and failing to be available within 30 minutes while on call; he acknowledged that when confronted with the violations, he lied to his department supervisors about his actions.

Before the retrial, the prosecution moved to exclude the evidence of Detective Franks's misconduct. The prosecutor argued the evidence of misconduct was unrelated to Detective Franks's work on Wilson's case; that it was "incendiary" and would distract the jury, "particularly jurors that have a resentment toward law enforcement or an inclination to believe that law enforcement does stuff like this all the time"; and that it would improperly discredit the entire law enforcement investigation. Defense counsel argued that the impeachment evidence was critical to the defense theory that Richards had been shown the third photo lineup and failed to select Wilson, undermining the value of his later photo identification. Without the impeachment evidence, Detective Franks would refute the defense theory by saying there were only two lineups "and the jury will then sit there without knowing that Detective Franks has done other things that are dishonest" and "will tend to believe him." The trial court acknowledged the impeachment evidence had "some probative value" but nonetheless excluded the evidence out of concern that "if we dirty Detective Franks enough, maybe some of that dirt is going to rub off on other investigators or other officers that participated in this investigation when there's really no evidence that that was the case."

During the retrial, Richards testified that he "chitchatt[ed]" with the perpetrator the entire ride and had "ample opportunity" to see his face. Richards repeated the description he had given to police at the scene — of a Black male in his 30s, with short hair and pock-marked skin, about six feet tall and 220 pounds, wearing a light-colored ski jacket — and described the weapon the perpetrator had used. In describing his later identification of Wilson, Richards testified that he could not remember whether he had seen two photo lineups or three. Sergeant Robert Dean, who supervised the preparation and conduct of the photo lineups, testified that three photo lineups were prepared but that he instructed Detective Franks not to use one of them, which had been marked as Exhibit 147, because the other subjects in the lineup did not look enough like Wilson. Sergeant Dean explained that officers ordinarily made a notation on lineups after showing them to a witness; the fact that Exhibit 147 did not contain such a notation suggested it had not been shown to Richards. Detective Franks also testified that he did not show the unauthorized lineup to Richards. As in the first trial, the defense attempted to impeach Detective Franks with his prior description of admonishments to Richards that, upon review of the tape-recorded lineup, was shown to be inaccurate. The prosecutor in response suggested the inconsistency was the result of a common, good-faith tendency of witnesses to provide their best recollection rather than confess they did not recall events perfectly.

The defense also presented evidence that Richards could have seen Wilson's image in the news before making his identification. Detectives on the case had prepared a "wanted" bulletin with Wilson's photo on it. The sergeant in charge of the investigation could not be sure whether it had been

disseminated to the public and did not recall whether Wilson's picture had been shown on television or printed in the newspapers. Just after Wilson was arrested in Ohio, he said he had been told his picture was "all over" the television and in the newspapers and Detective Franks told Wilson that investigating officers had asked the news to cover the fact that Wilson was wanted for murder. Richards had testified that he saw information about the murders in the news that prompted him to contact the police, and the defense observed that Richards identified Wilson in the photo lineup sometime after seeing the news reports.

### 2. *Discussion*

A witness may be impeached with evidence of a prior conviction or other conduct involving dishonesty or otherwise demonstrating moral turpitude, subject to the trial court's exercise of discretion under Evidence Code section 352. (*People v. Wheeler* (1992) 4 Cal.4th 284, 290–296; see *People v. Clark* (2011) 52 Cal.4th 856, 931.) Section 352 permits courts to limit such evidence if its probative value is substantially outweighed by the probability that it will consume undue time or create a substantial danger of undue prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352.)

Here, Wilson claims that excluding the evidence of Detective Franks's dishonesty constituted both an abuse of discretion under Evidence Code section 352 and a violation of his Sixth Amendment right to confront witnesses against him. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 623 ["[T]he right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility," although " 'trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-examination' " consistent with Evid. Code, § 352].) Wilson asserts that the exclusion also violated his constitutional rights to present a defense, to due process, and to reliable guilt and penalty determinations.[4]

Although the trial court has considerable discretion to decide whether to admit or exclude impeachment evidence (*People v. Clark, supra,* 52 Cal.4th at p. 932), it is questionable whether the trial court appropriately exercised its discretion to forbid the introduction of prior instances of Detective Franks's dishonesty. As an initial matter, the trial judge remarked that when he listened to the evidence in the first trial it did not seem particularly relevant. But the relevance of the evidence was not difficult to discern: To explain Richards's recollection of having seen three photo lineups and the existence of Exhibit 147, the defense theorized that Detective Franks could have shown Richards an unauthorized lineup and then lied about it to his supervisors and to the jury. Proof that the detective had recently flouted the constraints of his position and then lied

---

[4] The Attorney General argues that Wilson forfeited his constitutional claims by failing to raise them below. At trial, Wilson argued that the jury would tend to believe Detective Franks when he denied showing Richards an unauthorized lineup, and Wilson would be unable to offer a significant reason to doubt the detective's credibility. Although counsel did not specifically invoke the Sixth Amendment, due process, or constitutional reliability concerns, his argument emphasized the probative value of the impeachment evidence and its relation to the defense and " 'called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal.' " (*People v. Partida* (2005) 37 Cal.4th 428, 436.) The claim is therefore preserved.

about it to his superiors and other law enforcement officials would have been relevant to the jury in evaluating the defense theory. Without disputing the relevance of the evidence, the prosecutor sought to exclude it on the ground that it would be "incendiary" and would distract jurors. The trial judge agreed on this point, citing a risk that evidence of the misconduct would cast all law enforcement in a bad light: The court observed that if the defense were to "dirty Detective Franks enough" it could color the jury's view of other aspects of the police investigation. This concern, however, could broadly apply to any evidence presented to impeach the conduct of investigating officers. Here, there was nothing incendiary or unduly distracting in the evidence; nor is there a clear basis for concern that the jury would be unable to differentiate between evidence bearing on Detective Franks's instances of dishonesty to his superiors and the competence and integrity of other law enforcement officers not involved in those instances.

Ultimately, however, we conclude that any error in the trial court's decision to exclude the impeachment evidence is not grounds for reversal. Even assuming for the sake of argument that the trial court violated Wilson's constitutional rights as well as committing an error of state evidentiary law, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Despite the exclusion of evidence to impeach Detective Franks's testimony about the third photo lineup, the defense vigorously attacked the reliability of Richards's photo identification and continued to pursue the theory that Richards saw a photo of Wilson before identifying him. The defense presented evidence of a third lineup containing Wilson's photo, and although Detective Franks stated that he did not show it to

Richards, Richards remained uncertain whether he had seen it. There was also evidence that Wilson's photo may have been broadcast to the public when he was being sought in connection with the Dominguez and Henderson murders; the fact that Richards had been following news of the murders raised the possibility he could have been exposed to Wilson's photo in that context as well. In addition to evidence that Richards may have seen another photo of Wilson, the defense presented lengthy expert testimony on the fallibility of eyewitness memory and emphasized evidence that Richards was not able to pick Wilson out of a live lineup. Commenting on the fact that Richards at one point suspected someone who did not look much like Wilson, the defense expert suggested that Richards might not have actually remembered what the perpetrator looked like when he identified Wilson in the photo lineup. Thus, even without additional impeachment, the defense was able to significantly undermine the reliability of Richards's photo identification. The prosecution so acknowledged to the jury: At the conclusion of the case, the prosecutor said of Richards's photo identification that "absolutely I would concede that it is a very precarious identification scenario." The prosecutor nonetheless went on to argue that the evidence corroborating the photo identification was strong.

Given the other evidence of Wilson's responsibility for the crimes against Richards, any error in excluding the impeachment evidence was harmless beyond a reasonable doubt. On the night of the crimes — long before the photo lineups — Richards had described his assailant as a Black man in his 30s, about six feet tall and 220 pounds, with short hair and pock-marked skin. Wilson, who is Black, was 25 at the time, was just over six feet tall, weighed 225 pounds, and had short

hair and pock-marked skin. Richards also claimed that when he saw a picture of Wilson, it was Wilson's distinctive smirk that caught his attention, because he remembered seeing the same smirk on the night of the crimes. These aspects of Richards's description suggested that immediately following the incident he had some recollection of the perpetrator and his distinguishing features; that recollection was independent of the photo lineup that occurred nearly two months later. (Cf. *United States v. Crews* (1980) 445 U.S. 463, 473 [finding witness's in-court identification was based on an independent recollection of her assailant from their initial encounter and not on subsequent identification procedures].) Although the description was a general one, the other potential suspects, Seeney and Brad McKinney, were both just 18, and smaller, with no suggestion they had blemishes similar to Wilson's. Given the limited number of suspects, it was significant that Richards's description resembled Wilson and not Seeney or McKinney. Furthermore, although the defense had vigorously challenged the photo identification, it did not counter the significance of Richards describing his assailant immediately after the robbery and attempted murder.

In addition, there was considerable additional evidence to demonstrate Wilson's connection to the robbery and attempted murder of Richards. Evidence showed that the .22 pistol used against Richards was one of several guns taken in a home burglary and that Wilson later sold a rifle from the same stolen collection; in an interview with detectives after his arrest, Wilson admitted using a .22 pistol; Richards picked up his assailant across the street from the motel where Wilson's mother was living and Wilson had visited her just before that; authorities recovered Richards's abandoned taxicab one street

away from Wilson's apartment; the rural area in Bloomington where the crime occurred was familiar to Wilson because his grandparents lived nearby; and evidence connected Wilson to the commission of a murder in exactly the same location a month and a half later. The jury also heard from both Seeney and his girlfriend that Wilson had admitted robbing Richards and trying to kill him. The defense argued that both had an incentive to implicate Wilson and protect Seeney, who had been stealing guns with Wilson, lived in the same apartment with him, had the same mother, and might also have been related to the family in Bloomington. But the jury did not have to rely on Seeney and Woodruff's testimony to conclude that Richards's contemporaneous description of his assailant matched Wilson (and not Seeney) and that other evidence linking Wilson to the crimes against Richards was substantial. Notably, the prosecution did not present Detective Franks as a witness for any element of the case against Wilson; his testimony for the defense, and his credibility as to whether Richards ever viewed a third lineup, were ultimately not central to the case. In sum, any error in preventing the jury from hearing evidence tending to impeach Detective Franks's testimony about the third photo lineup was harmless beyond a reasonable doubt.

## C. Seeney's Preliminary Hearing Testimony

Wilson raises a series of objections to the presentation of Seeney's preliminary hearing testimony at the retrial. Although the trial court did err in one respect, by excluding later out-of-court statements casting doubt on aspects of Seeney's preliminary hearing testimony, there was no reversible error.

### 1. Background

Seeney was arrested and interrogated in Ohio before being transported to California and questioned further. During the Ohio interrogation, officers accused Seeney of lying when he claimed no knowledge of the murders under investigation; they stressed that he was facing decades of incarceration for the crimes and said that telling them what he knew was "the only thing that's going to save your butt." Seeney made no inculpatory statements during the questioning.

Later, after Seeney was transported to California, detectives emphasized the potential of leniency, suggesting that Seeney might avoid punishment for violating his probation if he told them what he knew about the robbery murders. Detective Chris Elvert testified that he confronted Seeney with details about the murder weapon, a .44 revolver, and told Seeney about information Seeney's girlfriend, Phyllis Woodruff, had already provided.[5] Specifically, Woodruff had said that Seeney was present when she saw Wilson with a large gun like a .44 revolver. During the interrogation, Detective Elvert told Seeney that if he were telling the truth, " '[y]ou're going to see your brother with a gun.' " When Seeney responded, " 'what am I going to get out of this?' " Detective Elvert observed that Seeney was only being held on a probation violation and said the detectives were " 'still investigating to determine what happened.' " Detective Elvert stated that he had confronted Seeney with his girlfriend's statements because Seeney was " 'very cautious' " about providing information about his brother. The detective also acknowledged telling Seeney that he planned

---

[5] The interview in which this transpired is not part of the record.

to tell Seeney's probation officer whether Seeney had been truthful.

Seeney eventually said that he had seen Wilson with a .44 revolver before the murders. He told the California detectives that he had been committing burglaries with Wilson and later pointed out the houses they had targeted; detectives were then able to verify burglaries and stolen property from those addresses. Seeney also claimed that Wilson told him that he planned to rob some cab drivers, that Wilson described his gun jamming when he tried to shoot one victim before taking his taxi, and that Wilson later admitted killing two other cab drivers.

Seeney testified for the prosecution at the preliminary hearing. At the hearing, Seeney appeared to be a reluctant witness. Much of the direct examination involved leading questions by the prosecution, which Seeney answered with brief affirmative responses. Seeney denied that Wilson made some of the incriminating statements the prosecutor sought to elicit, even though Seeney had previously repeated some of those statements when speaking to detectives. On cross-examination, Seeney stated that he felt the detectives had tried to scare him into cooperating. Detective Elvert testified that during Seeney's interrogation, detectives provided Seeney "small pieces of evidence" from the investigation to "encourage him to tell us the truth."

Seeney testified that when first questioned, he lied to detectives when he denied knowing anything about the crimes; he was later willing to say that "maybe" he saw his brother with a .44 revolver after detectives told him they already learned that fact from Seeney's girlfriend. Seeney denied that Wilson

admitted using Dominguez's cell phone, stating "[t]hat is what the detectives told me." Seeney also denied that Wilson showed him a wallet stolen from Richards, said that Wilson did not tell him what he had done to Richards, and claimed not to know what Wilson did with the gun he used in the Richards robbery; in each of these instances, the prosecutor corrected Seeney's testimony by referencing incriminating details from Seeney's interrogation.

Ultimately, although Seeney backtracked on some of the information, Seeney testified that Wilson described several details from robbing and attempting to kill Richards and confessed the murders to Seeney on two occasions.

After the preliminary hearing but before the first trial, Wilson's investigator interviewed Seeney. The interview focused on Seeney's interactions with detectives during his interrogations in Ohio and California. When asked whether the detectives had pressured him to say things that were not true, Seeney answered, "Some of it. . . . [¶] . . . [¶] . . . I'm not saying — he really didn't tell me a lot of — he didn't really tell me all them things. He didn't really tell me all of them." The defense investigator then asked Seeney, "How did you know what to say?" and Seeney claimed that he had only repeated facts the detectives had given him about the investigation. When asked whether he gave truthful information about the guns and Wilson's statements, Seeney said that his girlfriend had already told detectives that she and Seeney had seen Wilson with a gun and had described it; Seeney told the defense, "So I'm like — and, see, that's what really had me screwed right there. . . . I mean, she's saying I did, I mean, and we was all right there so, I mean, but — but, I mean, that's it." The remainder of the interview focused on whether Seeney had seen

Wilson with a .44 revolver. Seeney first said he did not know guns, could not say whether the gun he saw was a .44, "[i]t could have been a shotgun," but then said he had not seen anything like the investigator's rough drawing and description of a .44 revolver. Seeney said that the only gun he had seen was a "deuce five," a small pistol he saw in the possession of either Brad or Cory McKinney.

### 2. Asserted coercion

Because he invoked his Fifth Amendment privilege, Seeney was unavailable to testify for the trial or retrial.[6] Before trial, Wilson moved to exclude Seeney's statements and preliminary hearing testimony. In particular, he argued that Seeney's statements to law enforcement officers were coerced. This coercion, he argued, tainted Seeney's preliminary hearing testimony because Seeney had entered an immunity agreement with the People based on his "anticipated" testimony. The trial court denied the motion and Seeney's preliminary hearing testimony was read during the trial and retrial. Wilson now contends the trial court erred in denying the motion.

"Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion. Indeed, defendants generally lack standing to complain that a police interrogation violated a third party

---

[6] Although Seeney was given immunity to testify, he may have been advised to invoke his Fifth Amendment privilege for the later proceedings to avoid questioning that might expose him to accusations of having committed perjury during the preliminary hearing (conduct that would not have been covered by the immunity agreement).

witness's Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel . . . . [Citation.] A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion, however, if the defendant can establish that *trial* evidence was coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial." (*People v. Williams* (2010) 49 Cal.4th 405, 452–453.) "The burden rests upon the defendant to demonstrate how the earlier coercion 'directly impaired the free and voluntary nature of the anticipated testimony in the trial itself' [citation] and impaired the reliability of the trial testimony." (*Id.* at p. 453.) On appeal, "we independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair. [Citation.] In doing so, however, we defer to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)

When "assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable,' " and have explained that "[w]hether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation." (*People v. Smith* (2007) 40 Cal.4th 483, 501.) Here, drawing on *People v. Brommel* (1961) 56 Cal.2d 629, Wilson claims the interrogations were coercive because some officers threatened Seeney with a lengthy prison term and others offered him leniency. In *Brommel*, the defendant had

"persistently and consistently insisted" that he was not guilty throughout a lengthy interrogation. (*Brommel*, at p. 633.) Officers then threatened to inform the sentencing judge the defendant was a liar, suggesting it would ensure a harsh sentence and foreclose any leniency. (*Id.* at pp. 633–634.) The defendant finally confessed. We concluded the confession was coerced under the circumstances, based on, among other things, the implied promise of leniency if he "told the officers the story that they were insisting that he tell them." (*Id.* at p. 634.)

This case does not involve circumstances comparable to those in *Brommel*. Ohio officers accused Seeney of lying, emphasized the punishment Seeney could face for the crimes under investigation, and suggested he could avoid that fate by telling them what he knew. California officers similarly implied that Seeney could avoid some of his legal troubles by providing them with information about the crimes. Wilson adds that Seeney was 18 when he was interrogated, suggesting his youth made him more vulnerable to coercion. Under our precedent, however, none of the circumstances Wilson has identified amounts to unlawful coercion. We have said that officers may "exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying." (*People v. Battle* (2021) 11 Cal.5th 749, 791.) Accusing Seeney of lying or withholding information, without more, did not "rise to the threshold necessary to taint the interrogation as unlawful." (*People v. Spencer* (2018) 5 Cal.5th 642, 674.) Furthermore, there " 'is nothing improper in confronting a suspect with the predicament he is in, or with an offer to refrain from prosecuting the suspect if he will cooperate with the police investigation.' " (*People v. Badgett* (1995) 10 Cal.4th 330, 355.) " 'We have never held . . . that an offer of leniency in return for cooperation with the police

renders a third party statement involuntary or eventual trial testimony coerced.' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1170.) Finally, although Seeney was young at the time of the interrogations, he did have prior experience in the criminal justice system and Wilson does not claim that interrogating officers attempted to exploit his youth in any way. (See *People v. Dykes* (2009) 46 Cal.4th 731, 754; *People v. Winbush* (2017) 2 Cal.5th 402, 453.)

Wilson also asserts that Seeney's statements were coerced because the detectives told him what to say about seeing his brother with a gun. Wilson's argument refers to the exchange during which detectives recounted what Woodruff had already told them — including that Seeney was present when she saw Wilson with a large gun like a .44 revolver — and told Seeney that if he were telling the truth, "[y]ou're going to see your brother with a gun." Wilson contends the detectives coerced his statement about seeing Wilson with a gun by using threats and promises " 'to establish a predetermined set of facts.' " "Threats of punishment for failure to conform a statement to the police theory . . . may constitute coercion and, under some circumstances, produce an unreliable statement." (*People v. Smith, supra*, 4 Cal.5th at p. 1169.) Here, when Seeney hesitated to say he saw the gun and asked what he was going " 'to get out of this,' " Detective Elvert responded that Seeney was only being held on a probation violation and the detectives were " 'still investigating to determine what happened.' " But this response, and the detective's comment that he would tell Seeney's probation officer whether Seeney was telling the truth, was neither a threat nor a promise of leniency. Further, understood in context, it appears the detective's statement that "[y]ou're going to see your brother with a gun" was meant to

confront Seeney with information gleaned from another source; in particular, detectives were asking Seeney to address information the detectives had already obtained from Woodruff. Although the statement was phrased provocatively, the record does not establish that the statement rises to the level of impermissible coercion. As we have previously explained, "an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*People v. Spencer*, *supra*, 5 Cal.5th at p. 674.) To the extent Wilson argues that Seeney's statements to the detectives should have been excluded, we conclude that they were not coerced and that any reference to them during Seeney's testimony did not render Wilson's trial unfair.

Wilson's primary argument concerns the admissibility in Wilson's retrial of the testimony Seeney ultimately gave at the preliminary hearing. Even if Seeney's interrogation were coercive, Wilson would have to show that any coercion carried over to Seeney's preliminary hearing testimony. (*People v. Williams*, *supra*, 49 Cal.4th at p. 453; *People v. Smith*, *supra*, 4 Cal.5th at p. 1170.) He has not made that showing.

Wilson relies on Seeney's immunity agreement, which he argues improperly pressured Seeney to repeat his assertedly coerced statements. (See *In re Masters* (2019) 7 Cal.5th 1054, 1085 [it is coercive "for an agreement to require that the witness testify consistently with a previous statement to the authorities"].) Certainly, the agreement contained no such express requirement. In the petition for an order granting Seeney immunity, the prosecutor did generally outline Seeney's anticipated testimony, which was based on the statements he had given detectives. But the immunity agreement itself merely

46

stated that Seeney would " 'answer such questions and produce such evidence in the case as may be material, competent, and relevant to the case.' "

Wilson contends that Seeney nonetheless faced implicit pressure to conform his testimony to prior statements. To support the argument, Wilson points out that during the hearing on the motion to exclude his testimony, Seeney invoked his Fifth Amendment privilege against self-incrimination when asked whether his preliminary hearing testimony was true. Wilson suggests this episode shows that Seeney may not have given truthful testimony at the preliminary hearing. But even if we were to assume that to be the case, Wilson has not shown that the cause was implicit pressure to repeat what he had previously told detectives. Again, the immunity agreement required only that Seeney provide material, competent, and relevant testimony. "[A]lthough there is a certain degree of compulsion inherent in any plea agreement or grant of immunity" (*People v. Allen* (1986) 42 Cal.3d 1222, 1252), there is no indication Seeney was " 'under a strong compulsion to testify in a particular fashion' " (*id.* at p. 1251). For that reason, and because there was no evidence of prior coercion that could have rendered his testimony unreliable in any event (*People v. Williams*, *supra,* 49 Cal.4th at p. 453), admission of the testimony did not violate Wilson's rights to due process and a fair trial.

### 3. *Admissibility of statements to the defense*

During the retrial, Wilson sought to introduce a portion of Seeney's interview with a defense investigator in which Seeney claimed he had not seen Wilson with a gun as he testified in the preliminary hearing. The defense argued the statements were

admissible as a declaration against interest under Evidence Code section 1230, inasmuch as they suggested that Seeney committed perjury during the preliminary hearing, and as an inconsistent statement under Evidence Code sections 1235 and 770. The defense also argued that if not offered for their truth, the statements were at least admissible to impeach Seeney's prior testimony.

The trial court rejected each of the defense arguments. Regarding whether the statements were against Seeney's interest, the trial court observed that members of the defense had not asked Seeney about his testimony; the focus of the interview was Seeney's interaction with the police and any fear and coercion he might have experienced. In that context, viewing the circumstances both objectively and from Seeney's perspective, the court reasoned that a person in Seeney's position would not have realized that his statements might subject him to charges of perjury. The trial court rejected Wilson's claim that the statements could come in for their truth as inconsistent statements because Evidence Code section 1235 allowed for the admission of prior inconsistent statements and Evidence Code section 770 made that admission dependent on the witness's opportunity to respond to the inconsistencies; Seeney's statements, made after his testimony and when he was unavailable as a witness, did not fit within that exception. The trial court also reasoned that Evidence Code section 770 prevented the admission of Seeney's statements for the limited purpose of impeachment because the prosecution would not have an opportunity to examine Seeney about them. Wilson asserts that the trial court erred in excluding the statements.

Hearsay statements are generally inadmissible under state law (Evid. Code, § 1200, subd. (b)), but there is an

exception allowing admission of a statement that when made "so far subjected [the declarant] to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (*Id.*, § 1230.) "As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Grimes*, *supra*, 1 Cal.5th at p. 711.)

Another exception to the general hearsay rule applies to statements that are inconsistent with a witness's trial testimony. (Evid. Code, § 1235.) Such statements are admissible for their truth only when the witness has been given

"an opportunity to explain or to deny the statement" or is still subject to providing further testimony, unless "the interests of justice otherwise require." (*Id.*, § 770, subd. (a); *id.*, § 1235 [a statement inconsistent with trial testimony must be offered in compliance with Evid. Code, § 770].) When an inconsistent statement is not offered for its truth, but to impeach the credibility of a hearsay declarant, different rules apply. In that circumstance, "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." (*Id.*, § 1202.) Specifically, inconsistent statements may be used to impeach the former testimony of a witness who is no longer available to testify if the statements were made after the testimony occurred. (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (2015 ed.) foll. § 1202, p. 59; *People v. Blacksher* (2011) 52 Cal.4th 769, 806.)

On appeal, Wilson renews his argument that Seeney's statements were admissible as a declaration against interest.[7] Wilson reasons that Seeney's statements amounted to an admission that he had lied at the preliminary hearing under oath. Setting aside the merits of the characterization for the moment, the pertinent question for purposes of Evidence Code section 1230 is whether "a reasonable person in [Seeney's] position would have believed" that his statements to the defense investigator could expose him to prosecution for perjury. (*People*

---

[7] He does not renew his claim that the statement should have been admitted as a prior inconsistent statement.

*v. Grimes*, *supra*, 1 Cal.5th at p. 712.) Seeney had testified against his brother, implicating him in two murders and an attempted murder; he spent much of the subsequent interview with the defense investigator discussing his interaction with the police and explaining that he had given them information about Wilson because he was scared, felt pressured by the detectives, and only provided information they already had. Contrary to Wilson's assertion, Seeney did not recant all, or even a significant portion of, his preliminary hearing testimony. It is not surprising then, that Seeney exhibited neither awareness nor concern that his statements to the defense investigator might expose him to potential perjury charges. And without this awareness, the rationale for the exception — that a person's interest in avoiding criminal liability provides assurance of the veracity of a statement against that interest (*id.* at p. 711) — is lacking. The trial court did not abuse its discretion when it concluded that Seeney's efforts to disavow his damaging statements to the police in this context were not likely made with the possibility of perjury charges in mind, and therefore were not admissible as statements against the declarant's interest.

In the alternative, Wilson argues that Seeney's statements to the defense should have been admitted for impeachment purposes under Evidence Code section 1202. The Attorney General argues this issue is forfeited because counsel did not expressly invoke Evidence Code section 1202. We are not persuaded: An issue is preserved for appeal if "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).) Construing this provision "reasonably, not formalistically"

(*People v. Partida*, *supra*, 37 Cal.4th at p. 434), Wilson did not forfeit the issue; although Wilson may not have expressly invoked section 1202, he did ask the court to admit the evidence for impeachment purposes. That suffices to preserve the claim.

On the merits, we conclude that Seeney's statements to the defense were admissible impeachment under Evidence Code section 1202. In ruling otherwise, the trial court reasoned that Evidence Code section 770 prohibited introduction of the statements for impeachment absent an opportunity for the witness to explain or deny the statement. That prohibition, however, applies only to the statements of a witness who actually testifies at trial. (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 806.) Seeney was not available for the retrial and so did not testify; instead, his testimony from the preliminary hearing was read to the jury. (See Evid. Code, § 1291 [providing a hearsay exception for the introduction of former testimony by an unavailable declarant].) The rule for nontestifying declarants is different: Evidence Code section 1202 allows a party to challenge the credibility of hearsay evidence — including, specifically, "hearsay evidence in the form of former testimony" — "with evidence of an inconsistent statement made by the hearsay declarant *after* the former testimony was given, even though the declarant was never given an opportunity to explain or deny the inconsistency." (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code, *supra*, foll. § 1202, p. 59; see *Blacksher*, at p. 806 [statements were admissible under Evid. Code, § 1202 to impeach the former testimony of a witness who did not testify at trial].)

Here, Wilson sought to impeach Seeney's former testimony with statements made to a defense investigator after the former testimony was given. Seeney indicated that he was

not entirely truthful when speaking to detectives about Wilson's involvement in the crimes; for example, although he told detectives that he saw Wilson with a .44 revolver and later testified to that fact, Seeney told the defense investigator that he had never seen Wilson with that, or any other, type of gun. Evidence Code section 1202 authorized the introduction of Seeney's inconsistent statements for impeachment purposes, and the trial court erred in concluding otherwise. (See *People v. Grimes*, *supra*, 1 Cal.5th at p. 712 [a trial court abuses its discretion when it issues an evidentiary ruling based on a misunderstanding of the governing law].)[8]

Although we hold the trial court abused its discretion in excluding the impeachment evidence, the error was one of state law and not a violation of Wilson's constitutional rights. Wilson claims that the exclusion violated his right to present a defense, which in turn infringed on his rights to a fair trial and reliable guilt and penalty determinations. "Under federal law, a denial of the right to present a defense occurs when . . . '[t]he exclusions of evidence . . . significantly undermined fundamental elements of the accused's defense.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1008.) A court's application of ordinary rules of evidence generally does not impermissibly infringe on a defendant's right to present a defense. (*People v. Fuiava* (2012) 53 Cal.4th 622,

---

[8] Wilson asserts in the alternative that the ruling violated his right to present relevant evidence under article I, section 28, subdivision (f)(2) of the California Constitution, the Truth-in-Evidence provision. That provision eliminates state law restrictions on the admissibility of evidence that are more stringent than those under federal law. (*People v. Cahill* (1993) 5 Cal.4th 478, 500.) Because we conclude that the evidence was, in fact, admissible under state law, we need not consider this contention.

665–666.)  Here, although the court erred in its application of the rules of evidence, its mistake — judging the admissibility of impeachment evidence according to the statutory standard applicable to testifying witnesses, as opposed to nontestifying hearsay declarants — is not the sort of mistake that significantly undermined fundamental elements of Wilson's defense.  The error is unlike the cases on which Wilson relies, in which the exclusion of reliable hearsay entirely prevented the defendant from offering substantial evidence of another person's confession to the charged crime.  (E.g., *Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *Green v. Georgia* (1979) 442 U.S. 95, 96; see also *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752, 762.)  We conclude that no federal constitutional violation occurred.

Wilson also claims that the exclusion of Seeney's statements violated his right to confrontation under the Sixth Amendment.  The Attorney General contends that Wilson forfeited this argument by failing to raise his constitutional claim below.  Even assuming the claim is preserved, Wilson has not established a Sixth Amendment violation.  Restrictions on the impeachment of witnesses do not violate the confrontation clause when the jury would not have had a "significantly different impression" of the witness's credibility had the proffered evidence been allowed.  (*People v. Quartermain, supra,* 16 Cal.4th at p. 624; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.)  Here, Seeney's statements to defense investigators did not paint a significantly different picture of his credibility than his preliminary hearing testimony.  During his direct examination, Seeney denied that Wilson made some of the incriminating statements the prosecutor suggested, admitted lying to detectives, said that the detectives were trying to scare him into cooperating, and claimed that he only admitted seeing

Wilson with a .44 revolver after learning the detectives already had that information. In his statements to the defense investigator, Seeney more clearly denied seeing Wilson with guns, and made other comments about his fear of the detectives and adopting some of the information they provided. Seeney's statements to the defense raised issues about his credibility that were not dissimilar from those already apparent in his testimony, and thus did not offer such a significantly different impression of his credibility as to establish a potential violation of Wilson's confrontation rights. (*Quartermain*, at pp. 623–624.)

Having concluded that the trial court committed state-law error in excluding the evidence of Seeney's interview with the defense investigator, we must next ask whether the error was prejudicial and therefore requires reversal. We conclude the answer is no; there is no reasonable probability the jury would have reached a different verdict had it been made aware of what Seeney told the defense investigator. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Seeney's statements had limited impeachment value. The most significant statement was that Seeney had not seen Wilson with guns. But significant evidence in the record cast doubt on that assertion. Phyllis Woodruff testified that she helped Seeney and Wilson burglarize homes shortly before the murders and that among the items they stole were a number of guns. Seeney similarly admitted that he, Woodruff, and Wilson were committing burglaries together shortly before the murders. The .44 revolver used to commit the murders was part of collection of distinctive firearms that had been stolen in a burglary. Woodruff testified that she had seen Wilson with a .44 revolver and other guns that matched the description of the stolen cache, that Wilson said he had gotten the guns from burglaries, and

that Seeney was present when Wilson was showing off the .44. Given the considerable evidence that Seeney was involved in stealing guns with Wilson, and evidence that he was present when Wilson showed off the .44 revolver, the jury would not likely have lent much credence to Seeney's statement. Furthermore, some of Seeney's statements contradicted his claimed ignorance of the guns. Seeney stated, for example, that upon hearing investigating officers describe the gun used in the murders, he thought, "dang, you know? How they know that?"

The remainder of Seeney's statement to the defense investigator was nonspecific, and thus of even less impeachment value. Seeney said that Wilson "didn't really tell me all them things," and claimed that when speaking to detectives, he just endorsed some of the information they shared from their investigation. The implication of these statements — that Seeney may not have witnessed some of the facts he adopted when speaking to the detectives — reflected a credibility issue that was already apparent in Seeney's preliminary hearing testimony. Detective Elvert acknowledged providing Seeney with some information about the investigation to prompt Seeney's cooperation and Seeney testified that he only said he saw his brother with a gun once he knew detectives already had that information. Seeney denied knowing that Wilson admitted using Dominguez's cell phone; he also denied having knowledge of several facts related to the Richards robbery until confronted with prior statements inconsistent with those denials. In other words, Seeney's testimony about receiving some information from the detectives, and his denials and conflicting statements, already created uncertainty about whether Seeney personally witnessed some of Wilson's alleged statements and actions. An additional, vague remark that Wilson "didn't really tell me all

them things," would not have meaningfully altered the impression Seeney's testimony left with the jury.

It is true, as Wilson says, that Seeney's testimony — that Wilson confessed to robbing and attempting to shoot Richards, confessed to shooting Dominguez and Henderson, and showed off a gun like the murder weapon — provided some of the only direct evidence of Wilson's guilt. But for each of the charges Wilson faced, there was also evidence of his guilt that did not depend on Seeney's testimony.

We have earlier described the evidence linking Wilson to the robbery and attempted murder of Richards. That evidence included Richards's description of his assailant immediately after the crimes, a description that resembled Wilson and not the other potential suspects. The weapon used against Richards was a .22 pistol that jammed. Evidence connected Wilson to a burglary in which that pistol was stolen; during his interrogation, Wilson also admitted having a .22. Richards picked up the perpetrator at a grocery store across the street from the motel where Wilson's mother lived, and Wilson visited his mother just before the robbery. The perpetrator drove away in Richards's taxicab, which was later recovered right near Wilson's apartment. And the rural location of the Richards robbery was familiar to Wilson because his grandparents lived nearby. Dominguez, the second victim, was killed in the same location a month and a half later and Wilson used Dominguez's cell phone just hours after he was murdered. Witnesses testified that Wilson wore a jacket and had injuries consistent with being the shooter eyewitnesses to the Henderson murder described. Evidence that Wilson shot Henderson and attempted to shoot Richards lent support to the theory that he shot Dominguez as

well, as did Phyllis Woodruff's testimony that she had seen Wilson with a revolver like the murder weapon.

In sum, there is no reasonable probability that Seeney's statements to the defense would have meaningfully altered the reliance, if any, the jury placed on Seeney's testimony, as opposed to the other evidence pointing to Wilson's guilt.

## D.  Henry Woodruff's Testimony

At trial, Wilson unsuccessfully moved to exclude testimony from Phyllis Woodruff's father, Henry Woodruff, that Seeney told him that he did not want to leave the Woodruff home with Wilson because Wilson was "doing wrong" and Seeney did not want to violate his probation.  Wilson contends the admission of the testimony violated both state evidence law and his constitutional right to a fair trial.  We reject the argument.

Before Henry Woodruff's testimony, the defense objected to the prosecution eliciting any description of statements from Seeney to Woodruff, arguing that they were inadmissible hearsay.  The prosecutor responded that the statements were not being offered for their truth but were relevant to show Seeney's state of mind and conduct.  The trial court overruled the defense objection, observing that even if the statements were hearsay, they would be admissible to show Seeney's conduct in conformance with his then-existing state of mind.  Woodruff then testified that at the time of the charged murders, Seeney had been staying on the couch in the Woodruff home where his girlfriend, Phyllis Woodruff, also lived.  During a Woodruff family barbeque the day before the murders, Wilson arrived at the Woodruff home to pick up Seeney, but Seeney told Henry Woodruff that he did not want to leave with Wilson because Wilson was "doing wrong" and Seeney did not want to violate

his probation. Henry Woodruff allowed Seeney to stay at the Woodruff home rather than go to San Bernardino with his brother.

As relevant here, Evidence Code section 1250 provides that an out-of-court statement of the declarant's then existing state of mind is not made inadmissible by the hearsay rule when it is offered "to prove or explain acts or conduct of the declarant." (*Id.*, subd. (a)(2).) " '[A] prerequisite to this exception to the hearsay rule is that the declarant's mental state or conduct be factually relevant.' " (*People v. Geier* (2007) 41 Cal.4th 555, 586.) Such evidence is inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code § 1252; see *id.*, § 1250, subd. (a).) The hearsay rule does not apply at all, however, "if the declarant's statements are not being used to prove the truth of their contents." (Assem. Com. on Judiciary com., reprinted at 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1250, p. 420; see also Evid. Code, § 1200; *People v. Harris* (2013) 57 Cal.4th 804, 843.)

Wilson argues that Seeney's state of mind was not relevant to any issue in dispute. As the trial court noted, however, Seeney's stated concerns about Wilson's activities tended to "prove or explain acts or conduct" (Evid. Code, § 1250, subd. (a)(2)) relevant to the action — that is, staying at the Woodruff household rather than accompany Wilson to San Bernardino. Specifically, evidence that Seeney remained at Henry Woodruff's house that evening was relevant to counter the defense theory that Seeney could have been responsible for the murders that occurred hours later in the San Bernardino vicinity. As the prosecutor noted in arguing to admit Seeney's statements, defense counsel suggested in his opening statement that Seeney committed the murders or was an accomplice to

them and later presented evidence to suggest that Seeney's whereabouts on the night of the murders were unknown.

Acknowledging that Seeney's conduct was relevant as "an alleged alternative perpetrator[]," Wilson argues Seeney's statements were nonetheless inadmissible to explain his state of mind and related conduct because their relevance depended on his statements being true, that Wilson actually was engaged in wrongdoing. If Seeney's statement was admissible hearsay under a then-existing state of mind exception (Evid. Code, § 1250, subd. (a)(2)), then it could be used for its truth. (*People v. Harris*, *supra*, 57 Cal.4th at p. 843.) If the statement was not being used for its truth, then it was not hearsay at all. (*Ibid.*) Wilson appears to challenge the latter, nonhearsay use, relying on *People v. Lopez* (2013) 56 Cal.4th 1028. In that case, we concluded the admission of statements for the nonhearsay purpose of showing a codefendant's state of mind was error when the theory of relevance depended on the truth of the statements. (*Id.* at pp. 1060–1061.) Here, by contrast, Seeney's state of mind — that he did not want to go to San Bernardino with Wilson — was relevant to his apparently successful efforts to stay with the Woodruffs, an alibi for the murders. That showing did not depend on the truth of Seeney's statements that Wilson was engaged in wrongdoing or that Seeney was concerned with violating his probation, establishing a nonhearsay purpose for them.

Wilson argues that even if Seeney's statements had a relevant, nonhearsay purpose, they were inadmissible under Evidence Code section 1252 because they were not trustworthy. But that trustworthiness inquiry is a limitation on hearsay evidence admitted under a state of mind exception (Evid. Code, § 1252; *People v. Dworak* (2021) 11 Cal.5th 881, 907); it does not

apply to evidence that is not hearsay. As we have said, the prosecutor offered the statements for a nonhearsay purpose and there was no theory proposed under which the statements would be relevant for their truth.[9] But even if Evidence Code section 1252 applied, we would not find the statements inadmissible. In determining whether statements are trustworthy within the meaning of Evidence Code section 1252, we consider whether they "were made under coercion or 'with an intent to deceive.' " (*Dworak*, at p. 907.) Wilson contends Seeney's statements to Henry Woodruff were not trustworthy because Seeney had reason to "create a false impression that he was staying out of trouble." Wilson does not, however, explain how Seeney would curry favor with his girlfriend's father by commenting on his brother's criminal behavior.

### E. Wilson's Interview with California Detectives

Wilson argues the trial court erred in admitting a videotaped interview with California detectives, which he claims was conducted after he invoked his Fifth Amendment right to remain silent. We conclude there was no error.

---

[9] Wilson emphasizes a portion of the prosecutor's closing argument in which he referred to Seeney's statement to Henry Woodruff and knowledge of Wilson's plan to rob cab drivers; Wilson argues that this demonstrates that the prosecutor "was able to conceal his true purpose" of using Seeney's statements for their truth. The prosecutor's remarks, that Seeney would be an accomplice if he knew of the robberies and did something to help Wilson, were offered as "illustrations of the concept of aiding and abetting." Whatever the motive for repeating Seeney's statement, Seeney's knowledge of Wilson's activities was not an element of the charges against Wilson and was not relevant to any theory of the prosecution case.

### 1. *Background*

After his arrest, Wilson twice spoke to officers about his involvement in the robberies and murders under investigation: once in Ohio, shortly after the arrest, and then in California a day later. In Ohio, detectives advised Wilson of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Wilson initially agreed to speak to the detectives. One of the detectives testified that he believed Wilson later invoked his right to remain silent but continued questioning him anyway.

A day later, Wilson flew with detectives to California. Detective Jay Hagen, one of the detectives who flew with Wilson, testified that during a refueling stop Wilson said that he might want to talk about the case and asked whether his statement could remain confidential if he decided to say something. Detective Hagen advised Wilson to wait until they arrived in California. Once in California, Detective Hagen and another detective met with Wilson. Detective Hagen made it clear that Wilson's statements would not be confidential and there was some additional discussion regarding Wilson's concern about providing information. Upon learning that he was being held on a prior hit-and-run charge, Wilson stated, "Let's put that to the side, man. I mean, what's going on with these other things?" — apparently referring to the recent robberies and killings. Detective Hagen said there was information tying Wilson to those crimes and told Wilson he wanted to find out if Wilson had an explanation for his involvement.[10]

---

[10]    Detective Hagen conducted much of the interview and testified about the interrogation. The second detective also participated in the interview, and there were times when

When Wilson began to speak to the detective, he repeated several times that he did not want to jeopardize his family by giving information that would cause others to retaliate against him. The detective said that Wilson would not have to worry about his brother because Seeney would be in prison as an accessory to murder. The conversation then focused for a time on whether there was evidence to send Seeney to prison; Wilson said there was nothing connecting Seeney to the crimes and the detective said that Seeney would at least do time for protecting Wilson. Wilson accused the detective of playing games with him and said he would have to request his right to remain silent. But Wilson immediately went on to challenge the detectives, stating that they did not have a murder weapon, fingerprints, or eyewitnesses to connect him to the murders. When the detective asked how Wilson knew whether they had a murder weapon, Wilson said he learned it from the deputies in the county jail. The detective noted that was days ago, suggesting there was evidence against Wilson. When pressed, Wilson first said he learned from the news that there were no fingerprints and then said he learned it from the jail deputies, but the detective dismissed the explanations and accused Wilson of playing a game. Discussing Seeney's role, the detective again stated that Seeney would be charged as an accessory to murder for protecting Wilson and Wilson asked if Seeney's girlfriend would be charged for protecting him as well. The detective said, "[T]he girl gave it all up" and Wilson remarked that her parents probably did too. Wilson asked whether the detectives had the

---

Detective Hagen left the interview room. To avoid parsing each detective's role, we use the shorthand "the detective" in our discussion of the interview.

Woodruffs on tape, which the detective declined to answer. The detective said he would not respond because Wilson was just trying to get information about the case.

Wilson then told the detective, "I'm not discussing it any no further until I talk to the DA, man." When informed the prosecutor was not interested in speaking with him, Wilson reiterated that he was not "going to discuss it further. I mean, I'm was [*sic*] trying to be cooperative with you." The detective encouraged Wilson to take the opportunity to say what he knew "right now," before his "partner" got a deal with the prosecutor. The detective also told Wilson that he had "[n]o doubt [Wilson] did it." Wilson responded that, if there was no doubt, "we don't need to talk no more" and he asked the detectives to take him back to his holding cell. Just before they left the interview room, the detective stated, "You say you wanted to cooperate. I know there's somebody else involved." As they exited the room, Wilson asked for a cigarette.

Without explanation the interview resumed, with Wilson again talking about his concern for his family. The detective eventually suggested that Wilson could name the person responsible for the murders and "we'll open the door, you're out of here." Wilson said, "they know who the fuck he is" and indicated there were other government actors trying to catch him. Wilson then referred to his brother again, stating he did not think the detectives had any evidence against Seeney.

Wilson guessed that he was the only suspect; he said, "True enough I told you I rented the car, I used the phone," "I allowed this particular person to use that vehicle more than once," and "if he has some buddies or something like that and they went on a killing spree, . . . I don't know." The detective

asked who Wilson went to Pomona with, but Wilson denied being there. Suggesting that someone saw Wilson with a gun, the detective asked if that would be a lie. Wilson said that maybe "they seen me with a pistol." The detective said he knew Wilson's "homeboy" had a gun, the "[s]ame homeboy that I know that you know." Wilson wanted the detectives to say the name of the person they had in mind, adding "the same person who rented the vehicle" and "the same person that seen me with a gun" a "little chrome gun." Wilson admitted having "a little .22."

The detective tried to engage Wilson in whether he or his "homeboy" pulled the trigger during the murders. The detective suggested a scenario in which Wilson was with a buddy who robbed and killed someone out of the blue and then insisted on doing another one, to make sure Wilson would not rat. Wilson said, "In other words, drop a dime, snitch." Wilson would not snitch but said there was a witness on the street. The detective and Wilson talked about how much Seeney might have said about the events, but the detective would not mention specific information about the case. Wilson said the detectives would eventually have to give the information to his lawyer and the conversation turned to when Wilson would get a lawyer and what his bail was.

Wilson made it clear he understood that his statements could be used against him, stating, "You know damn well as much as I know everything I say in this room is going to be held against me in that damn courtroom." The detective reminded Wilson that he could have an attorney, and Wilson said that he wanted one "right now." The detective said they did not have an attorney for Wilson but would stop talking about the case. Wilson responded, "Is that what you want?" Wilson said he was hungry and suggested getting something to eat, "so we can

continue this interrogation." While one detective went to see about getting food, Wilson said to the other one, "this man can continue to interrogate me. You ain't got nothing to do." After learning the detectives had the cell phone, Wilson asked to see it. Asking for coffee, Wilson said, "We all going to sit down and fucking talk." Later, referring to his coffee Wilson said, "We going to be up all fucking night."

In the remaining interview, Wilson told the detective that he always carried a gun when he went to San Bernardino but denied ever carrying a large caliber weapon. Wilson would not give the name of the person he knew was involved in the murders but said that Detective Franks had mentioned the name and "hit that thing on the nose." The detective asked where the person lived, prompting, "where Sarah and Tiffany dropped you off?" Wilson said that "Sarah knows the dude" and "[y]ou got your man."

Wilson filed a motion to suppress all of the statements made to detectives in Ohio and in California. The trial court granted Wilson's motion to suppress statements he made during the Ohio interrogation after the detective disregarded his expressed desire to stop answering questions. But the court admitted the interview with detectives in California. The trial court found that Wilson had been advised of, understood, and waived his *Miranda* rights in Ohio, and further noted that during the California interview Wilson recited his rights back to the detectives. The court concluded that Wilson initiated the California interview during the refueling stop by telling Detective Hagen he wanted to talk and that it was clear Wilson understood that by talking to the detectives he was waiving his right to remain silent. The court further held, contrary to

Wilson's contentions, that Wilson did not seriously invoke his right to terminate the conversation.

The trial court characterized the California interrogation as a "chess game, where each side was trying to obtain damaging information from the other" and observed that "[f]or the most part, neither side budged, although the defendant did admit to using one of the murder victim's cellular phones . . . , and did admit to having a small caliber handgun within two to three weeks prior to the murders." The trial court noted several places in the interview where the defense claimed Wilson had invoked his right to remain silent. The court observed, however, that Wilson's willingness to talk contradicted his claim that he invoked his Fifth Amendment privilege.

During the retrial, defense counsel brought another motion to suppress Wilson's statements because he had overlooked the significance of the cigarette break and the unexplained resumption of the interview; he sought to exclude the statements Wilson made after the break.

The trial court held a hearing focused on the unrecorded break. Detective Hagen testified that after he and Wilson left the interview room, they stopped to smoke and Wilson initiated further discussions about the case. Wilson again stated that he was concerned for his family's safety if he told the detectives what he knew about the murders and continued to ask questions in an effort to learn what the investigation had uncovered. Detective Hagen said that he answered Wilson's questions as best he could without giving him details about the investigation; it was the same type of exchange that characterized the interview before the break. When they finished smoking, Detective Hagen asked Wilson if there was anything else to

discuss and Wilson indicated that he wanted to continue the interview.

Defense counsel argued that suppression was warranted because, "[p]utting aside all the other loquacious behavior of Mr. Wilson," the detectives were not able to describe in detail how Wilson initiated conversation about the case during the break; acknowledged that they had been trained to continue questioning after a defendant's invocation for impeachment purposes; and failed to document any reinitiation by Wilson in their reports. Counsel asserted that the proper inference to draw was that the detectives felt they were questioning outside of *Miranda*.

The trial court denied the motion, crediting Detective Hagen's testimony that Wilson initiated the conversation during the break and concluding that "nothing really changed from all of the other times that [Wilson] had seemingly not wanted to talk, but then kept on with the interview." At the retrial, the prosecution played the video recording of Wilson's California interrogation for the jury.

### 2. Discussion

"The Fifth Amendment provides, 'No person . . . shall be compelled in any criminal case to be a witness against himself . . . .' (U.S. Const., 5th Amend.) 'To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the "inherently compelling pressures" of custodial interrogation (*Miranda, supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 930–931.) Interrogation " 'under

*Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response . . . .' " (*People v. Young* (2019) 7 Cal.5th 905, 923.)

After " 'a defendant has waived his *Miranda* rights and agreed to talk with police, any *subsequent* invocation of the right to counsel or the right to remain silent must be unequivocal and unambiguous.' " (*People v. Hoyt, supra,* 8 Cal.5th at p. 931.) If a defendant has unambiguously invoked the right to remain silent, the interrogation must stop. (*People v. Krebs* (2019) 8 Cal.5th 265, 313.) We have never held, however, "that an initial failure to honor a defendant's invocation — whether of the [right] to remain silent or the right to have counsel present — poses a categorical bar to the admission of any subsequent statement regardless of the circumstances." (*Id.* at p. 314.) Even when law enforcement initially fails to honor a *Miranda* invocation, we have held that "a *voluntary* confession obtained during a *subsequent* interrogation is admissible." (*Ibid.*)

When reviewing the trial court's denial of a suppression motion alleging a *Miranda* violation, " 'it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 385.) The question whether the defendant or the police reinitiated communications after a defendant's invocation of rights "is predominantly factual. [Citation.] Accordingly, we review it for substantial evidence." (*Ibid.*)

There is no dispute that the Ohio detectives did not honor Wilson's invocation of *Miranda* rights, and that statements Wilson made to the Ohio detectives after that point should have been excluded. The question that concerns us here is the admissibility of statements Wilson made to California detectives the following day. Wilson first argues that all of his statements to the California detectives should have been suppressed because detectives improperly reinitiated the interrogation on the flight from Ohio to California. Wilson claims the flight conditions created "inherent pressure" for Wilson to speak to them. Wilson invokes the circumstances described in *People v. Boyer* (1989) 48 Cal.3d 247, in which an investigator unlawfully reinitiated the interrogation when he called the defendant back into the interrogation room and "launched into a monologue on the status of the investigation," telling the defendant a new witness had contradicted the defendant's claims about when he last visited the victim. (*Id.* at p. 274.) Nothing remotely similar occurred here. In fact, it was undisputed that when Wilson broached the case during the trip back to California, Detective Hagen put him off. Once in California, Wilson acknowledged that he had approached Detective Hagen to talk about the case, repeated his interest in discussing the case, and readily engaged in the subsequent interview with the detectives. Substantial evidence supports the trial court's conclusion that Wilson reinitiated communication with the detectives after the Ohio interrogation, and not the other way around.

Wilson next argues that the trial court erred in admitting statements he made to detectives after the break when he was outside smoking with Detective Hagen. As Wilson notes, Detective Hagen agreed to end the interview in response to Wilson's statement that he was not going to discuss the case

70

further and request to be taken back to the holding cell. These circumstances reflect Wilson's unambiguous invocation of his right to remain silent. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 313 [defendant's invocation was unambiguous when he asked to be returned to his cell and told officers he had nothing to say].) Despite recognizing that Wilson no longer wished to speak, Detective Hagen made additional comments that were reasonably likely to prompt Wilson to continue speaking: He encouraged Wilson to cooperate "right now" to get beneficial treatment by the prosecutor; he said he had no doubt Wilson committed the crimes; he repeated Wilson's claimed interest in cooperating; and he told Wilson that he knew someone else was involved. The comments did not elicit any response and Detective Hagen ended the interview and began taking Wilson to a holding cell as he requested.

What followed, however, was a short break in which the trial court concluded that Wilson reinitiated discussion about the case. When a suspect freely decides to reinitiate communication, the law does not foreclose the admission of subsequent statements, notwithstanding an earlier failure to honor an invocation of the *Miranda* rights to silence or to counsel. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 315.)[11]

---

[11] Wilson frames his claim as a violation of his right to silence under *Michigan v. Mosley* (1975) 423 U.S. 96 but contends that *Edwards v. Arizona* (1981) 451 U.S. 477, which set out a more stringent standard for resuming interrogation following the invocation of a right to counsel, governs the inquiry here. It is unnecessary to address any potential distinction between the two standards, however, because we conclude that there is substantial evidence that Wilson

Here, although the conversation during the break was not recorded, the court credited the detective's testimony that Wilson brought up the case again, noting that Wilson's apparent invocation, followed almost immediately by an expression of continued interest in discussing the case, followed a pattern that was apparent throughout the interview. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1089 [finding valid reinitiation of communication when the defendant initiated discussion of the case 20 seconds after invoking *Miranda* rights].) After the break, Wilson repeatedly demonstrated his desire to continue the interrogation, asking for food and coffee in anticipation of talking at length and periodically goading the detectives to continue discussing the case with him. The record contains no suggestion Wilson was pressured into continuing the interview. "Apart from his failure to immediately cease questioning, [the detective's] interrogation techniques were not coercive," and there is no other evidence Wilson was unable to exercise his free will when he decided to continue speaking to the detectives. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 315.) We see no error in the trial court's decision to admit the statements Wilson made after the cigarette break.

## F. Motion for New Trial

After the jury returned its penalty verdict, Wilson filed a new trial motion in which he argued that his lawyer prevented him from testifying in violation of his Sixth Amendment rights. The trial court denied the motion. Wilson argues this was error. We find no merit to the claim.

---

voluntarily reinitiated his interview after the break, which would render his subsequent statements admissible under either *Mosley* or *Edwards*.

Wilson did not testify in either of his trials. In a report prepared for purposes of sentencing, a probation officer documented Wilson's complaint that he wanted to testify in the retrial but his attorney " 'refused to allow it.' " At defense counsel's request, the trial court appointed alternate counsel to explore the issue, and alternate counsel later filed a motion for a new trial alleging that Wilson had been deprived of his right to testify. In a sworn declaration accompanying the motion, Wilson said he asked to testify several times, but that trial counsel informed him that "[his] side of the story could be told by other witnesses" and that testifying would expose him to impeachment regarding his past criminal history. Wilson claimed that after the prosecution rested, he again expressed his desire to testify and counsel "told me that I couldn't testify and walked away, not allowing any further discussion." Wilson stated that he was not aware that he could have asserted a right to testify over counsel's objection until after trial.

In a hearing on alternate counsel's new trial motion, defense counsel testified that he had been practicing criminal law for over 35 years, that he understood Wilson's constitutional right to testify, and that he had never denied Wilson his right to testify. Counsel denied telling Wilson "in emphatic, conclusive terms that he was not going to testify in the case"; instead, counsel stated that he had conversations in which he recommended that Wilson not testify.

As an initial matter, the trial court questioned whether Wilson's request to testify was timely, coming as it did after the jury had returned its verdicts. The court noted that Wilson "has never been shy about speaking or letting his requests be known" and that neither Wilson nor his counsel alerted the court to any conflict they had about Wilson wanting to testify. In any event,

crediting defense counsel's testimony, the court found that counsel had not denied Wilson his right to testify, although counsel may have strongly advised Wilson not to testify "for good reason." When alternate counsel raised Wilson's claim that he did not know he had a right to testify against counsel's advice, the trial court reiterated that "[e]ven assuming that's true," counsel did not prevent Wilson from testifying.

"A criminal defendant has the right to testify at trial, 'a right that is the mirror image of the privilege against compelled self-incrimination and accordingly is of equal dignity.' [Citations.] 'The defendant may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel. [Citations.] "When the decision is whether to testify . . . at the guilt phase of a capital trial [citation] it is only in case of an express conflict arising between the defendant and counsel that the defendant's desires must prevail. . . . [T]here is no duty to admonish and secure an on the record waiver unless the conflict comes to the court's attention." ' " (*People v. Duong* (2020) 10 Cal.5th 36, 55.)

Here, Wilson does not claim that he had an express conflict with his trial attorney over whether he would testify. Instead, he contends the trial court had an obligation, before ruling on his motion for a new trial, to determine whether Wilson made a knowing and intelligent waiver of his right to testify during the retrial. Wilson did not raise this issue in the trial court, and it appears to be forfeited. The claim also lacks merit.

It has long been the rule that, absent an express conflict, " ' "[a] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising

his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy. . . ." [Citation.] If that assumption is incorrect, defendant's remedy is not a personal waiver in open court, but a claim of ineffective assistance of counsel.'" (*People v. Duong, supra*, 10 Cal.5th at p. 56; *People v. Bradford* (1997) 14 Cal.4th 1005, 1053.) The trial court did not abuse its discretion when it found that defense counsel did not infringe on Wilson's right to testify and that no conflict arose during the retrial that required the court to advise Wilson of his right to testify and ensure his knowing and intelligent waiver of that right. Like the defendant in *Duong*, Wilson "does not urge his counsel was ineffective, nor does he allege there was a conflict with counsel. Any claim of ineffective assistance based on evidence not in the trial record must be made in a habeas corpus petition." (*Duong*, at p. 56.)

### G. Speedy Trial Rights

Wilson contends the trial court abused its discretion, and violated his state and federal constitutional rights to a speedy trial, when it found good cause to continue the trial over his objection. We find no error.

Wilson was arrested on March 3, 2000, and his trial attorney was appointed the same month. After accepting several continuances, in October 2001 Wilson refused to agree to a 90-day continuance his attorney had sought; instead, invoking his speedy trial rights, he waived time for just 30 days. In keeping with Wilson's 30-day waiver, the court set trial for December 3, 2001. Then, in a written motion for continuance, defense counsel sought a trial date of March 4, 2002. Counsel explained that he was preparing the defense of another client facing capital charges and needed additional time to

competently prepare Wilson's case. The prosecutor did not object to the March 2002 trial date.

At a hearing on the continuance motion, Wilson again refused to waive time and asserted that his constitutional rights were being violated. Wilson stated that the 18 months that had elapsed since his case began was adequate time to prepare his defense. The trial court granted the continuance over Wilson's objection. The court noted that since Wilson did not want to waive further time, counsel was going to have to "devote his full efforts preparing for this case. But I think I have to give him a reasonable time to prepare, and again I think it would be in your best interests to allow him to do that." Trial began on March 4, 2002.

"A criminal defendant's right to a speedy trial is guaranteed by the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution. 'The California Legislature has "re-expressed and amplified" these fundamental guarantees by various statutory enactments, including Penal Code section 1382.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 552–553.) Penal Code section 1382 provides that in a felony case, absent a showing of good cause, the court shall dismiss the action if a defendant is not brought to trial within 60 days of arraignment. (*Id.*, subd. (a)(2).) Factors relevant to a determination of good cause include: "(1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay." (*People v. Sutton* (2010) 48 Cal.4th 533, 546.) In general, delay for the defendant's benefit constitutes good cause to continue trial over his or her objection. (*Lomax*, at p. 554.) A trial court has " 'broad discretion to determine whether good cause exists to

grant a continuance of the trial' "; we review that determination for abuse of discretion. (*Sutton*, at p. 546.)

Wilson argues that "[a]n attorney's work for other clients cannot form a valid basis for overriding appellant's speedy trial rights." (Italics omitted.) Likening his case to *People v. Johnson* (1980) 26 Cal.3d 557, Wilson claims he was entitled to dismissal of the charges because systemic flaws, including lack of personnel in the Public Defender's office, prevented his attorney from preparing for his trial within the statutory time period. In *Johnson*, postponements over the defendant's objection "were not sought nor granted to serve the best interest of the defendant; they stem[med] from calendar conflicts of the public defender, and the decision of the public defender and the court to resolve these conflicts by trying other cases in advance of that of defendant." (*Id.* at p. 566.) We held that the record did not demonstrate good cause for a continuance because the trial court "accepted the public defender's recital of conflicting obligations without inquiring whether the conflict arose from exceptional circumstances or resulted from a failure of the state to provide defendant with counsel able to protect his right." (*Id.* at p. 573.)

Unlike *Johnson*, this case does not involve delay stemming from calendar conflicts unrelated to Wilson's best interests. Although counsel assumed the trial of another client would precede Wilson's, the trial court conditioned the continuance on counsel devoting his "full efforts" to preparing Wilson's case and found that preparation was in Wilson's best interest. Although Wilson blames a systemic breakdown for counsel's delay in completing his preparation, the record does not contain facts about the public defender system that would allow us to evaluate this assertion. (*People v. Williams* (2013) 58 Cal.4th

197, 249.) Instead, Wilson's circumstances appear more like those we have found to present "a classic confrontation between defendant's statutory and constitutional rights to a speedy trial and his Sixth Amendment right to competent and adequately prepared counsel." (*People v. Lomax, supra*, 49 Cal.4th at p. 556.) As in *Lomax*, the balance here favored a reasonable time for counsel to prepare for a capital trial (*ibid.*), and the duration of the delay was limited; after Wilson invoked his right to a speedy trial, counsel sought, and the trial court granted, only one continuance. There was no abuse of discretion in finding good cause for the continuance under Penal Code section 1382, and no violation of the state constitutional protections those procedures implement (*Sykes v. Superior Court* (1973) 9 Cal.3d 83, 88).[12]

Wilson also claims that delay in bringing his case to trial violated his federal speedy trial right. To determine whether there has been a federal violation, we consider the four-part balancing test established in *Barker v. Wingo* (1972) 407 U.S. 514: " 'whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.' " (*People v. Williams, supra,* 58 Cal.4th at p. 233.) Wilson has not carried his burden of demonstrating a speedy trial violation under this test.

---

[12] We have explained that "a defendant may claim a violation of the state Constitution's speedy trial right based on delay not covered by any statutory speedy trial provision." (*People v. Martinez* (2000) 22 Cal.4th 750, 766.) Wilson's state constitutional claim, however, rests on the statutorily established delay.

"In a complex case, delay will weigh less heavily against the state because the significance of the delay 'is necessarily dependent upon the peculiar circumstances of the case.'" (*People v. Williams*, *supra*, 58 Cal.4th at p. 234.) In a death penalty case, a two-year delay in proceeding to trial "is not inordinately long." (*People v. Lomax*, *supra*, 49 Cal.4th at p. 558.) Furthermore, Wilson acknowledges that the continuances were at his attorney's behest, "and because we cannot conclude on this record that the delays caused by defendant's counsel resulted from a systemic breakdown in the public defender system," that delay "must be charged to defendant." (*Williams*, at p. 252.)

"Whether defendant suffered prejudice as a result of the delay must be assessed in light of the interests the speedy trial right was designed to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" (*People v. Williams*, *supra*, 58 Cal.4th at p. 235.) "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (*Barker v. Wingo*, *supra*, 407 U.S. at p. 532.) Here, Wilson claims that "awaiting trial while his life hung in the balance inevitably produced great anxiety." "[D]espite the oppressive nature of pretrial incarceration and the anxiety it produces," Wilson does not "demonstrate specific prejudice resulting from the delay" and "he cannot benefit from a presumption of prejudice because the record does not show that the state was responsible for the delay." (*Williams*, at p. 252.)

Considering "the totality of the *Barker* factors" (*People v. Williams*, *supra*, 58 Cal.4th at p. 252), we conclude that Wilson's federal right to a speedy trial was not violated.

### H. Other Instructional Issues

Wilson claims that several guilt phase jury instructions violated his right not to be convicted " 'except upon proof beyond a reasonable doubt,' " thus violating his constitutional rights to due process and trial by jury. Wilson acknowledges that we have rejected similar claims, holding that CALJIC No. 2.01 does not undermine the reasonable doubt requirement (*People v. Wright* (2021) 12 Cal.5th 419, 455) and that CALJIC Nos. 2.21.2, 2.22, 2.27, and 8.20 do not urge the jury to decide material issues by determining which side had presented relatively stronger evidence (*People v. Bloom* (2022) 12 Cal.5th 1008, 1056). We decline his request to reconsider our prior rulings.

### I. Cumulative Error

We have assumed or found three errors. We have assumed that an instruction listing eyewitness certainty as a factor in assessing the accuracy of Richards's identification was a potential error under state law and that the trial court erred when it excluded evidence to impeach testimony about Richards's photo identification. We concluded, however, that it was not reasonably probable that the instruction misled the jury to Wilson's detriment and that exclusion of additional evidence to challenge the reliability of the photo identification was harmless, in part because of defense counsel's already successful efforts in that regard. We also found that the trial court erred when it excluded certain statements Seeney made to the defense that were purportedly inconsistent with his former testimony read into the record at the retrial. But we found it was not reasonably probable that evidence of Seeney's statements would have significantly altered the jury's view of Seeney's former testimony, or, ultimately, its conclusion that Wilson was guilty of the charged crimes. Having found these assumed or found

errors individually harmless, we reach the same conclusion when considering the errors together: " 'their cumulative effect does not warrant reversal of the judgment.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 48.)

## J. Challenges to California's Death Penalty Statute

Wilson raises a number of challenges to California's death penalty statute, all of which we have previously considered and rejected. We decline to reconsider the following holdings.

Penal Code section 190.2 is not impermissibly broad and adequately narrows the class of murders for which the death penalty may be imposed. (*People v. Jackson* (2014) 58 Cal.4th 724, 773.) Penal Code section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in sentencing "does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution." (*People v. Flinner* (2020) 10 Cal.5th 686, 761.) In instructions to the jury, the trial court is not required to " 'delete inapplicable factors' " from CALJIC No. 8.85, and the language " ' "so substantial" ' " and " 'warrants' " in CALJIC No. 8.88 is not unconstitutionally vague. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 57, 56.)

"Nothing in the federal Constitution requires the jury, at the penalty phase, to make written findings; to unanimously agree that particular aggravating circumstances exist; or to find beyond a reasonable doubt that aggravating factors exist, that aggravating factors outweigh mitigating factors, or that death is the appropriate sentence." (*People v. Jones* (2017) 3 Cal.5th 583, 618–619.) The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 446, *Ring v. Arizona* (2002) 536 U.S. 584,

*Blakely v. Washington* (2004) 542 U.S. 296, *Cunningham v. California* (2007) 549 U.S. 270, and *Hurst v. Florida* (2016) 577 U.S. 92 do not require otherwise. (*Jones*, at p. 619.) Nor does the federal Constitution require the trial court to instruct the jury "that the prosecution has the burden of persuasion regarding the existence of aggravating factors, the weight of aggravating versus mitigating factors, and the appropriateness of a death judgment. [Citations.] In addition, the trial court need not instruct the jury that life without parole was presumed the appropriate sentence." (*People v. Garton* (2018) 4 Cal.5th 485, 522–523.)

The state death penalty scheme does not violate the federal Constitution by forgoing intercase proportionality review, does not violate equal protection by treating capital and noncapital defendants differently, and does not violate international law and norms. (*People v. Salazar* (2016) 63 Cal.4th 214, 257.) The exercise of prosecutorial discretion in different counties does not violate equal protection; *Bush v. Gore* (2000) 531 U.S. 98 does not require otherwise. (*People v. Brady* (2010) 50 Cal.4th 547, 589.)

## III. MOTION FOR A STAY AND LIMITED REMAND

While Wilson's appeal was pending, the Legislature passed the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (RJA or the Act), which provides statutory authority for defendants to challenge criminal proceedings on the basis of racial, ethnic, or national origin discrimination. As later amended, the RJA applies to cases involving a death sentence, as well as to all cases in which the judgment is not yet final. (Pen. Code, § 745, subd. (j); Stats. 2022, ch. 739, § 2.)

Wilson does not raise RJA claims in this appeal, so we do not have any occasion to interpret or apply the RJA's substantive provisions here. Wilson has, however, raised a preliminary procedural question about the litigation of RJA claims that require the development of new evidence outside of the appellate record. Specifically, after briefing in this case was complete and after this court issued a letter advising the parties that the case would be set for oral argument, Wilson filed a motion asking this court to instead stay the appellate proceedings and to remand the case to the superior court, where he intends to raise RJA claims based on evidence outside of the appellate record. In the alternative, if this court proceeds to decide the claims he has raised on appeal, Wilson asks that we remand the case for litigation of his RJA claims without entering a final judgment on his direct appeal. The question we must address is whether Wilson has shown good cause to stay the adjudication of his direct appeal while he returns to superior court to raise and develop evidence supporting new RJA claims unrelated to the claims he has raised on appeal.

Wilson's primary argument is that, under the RJA, good cause for a stay of a pending appeal is automatically established whenever a defendant signals an intent to raise a colorable RJA claim in superior court, as he has done here. In effect, he argues that the RJA establishes an across-the-board rule authorizing automatic stays of all pending criminal appeals for litigation of RJA claims based on evidence outside of the appellate record. We understand the statute differently. While the RJA refers to a defendant's ability to move for a stay of appeal and remand, the statute does not establish a rule of automatic stays. As in other contexts in which courts have employed a stay-and-remand procedure, good cause for an appellate stay in this

context depends on a case-specific consideration of the reasons proffered for delaying the adjudication of the appeal.

To evaluate the question of good cause in this case, we clarify at the outset that a stay and remand is not legally necessary to allow an appellant to raise RJA claims that are unrelated to the appeal. Under both the RJA and long-settled principles of law, appellants are entitled to file a concurrent habeas corpus petition raising extrarecord RJA claims in superior court, regardless of where the proceedings stand in the appeal. (Pen. Code, § 1473 (section 1473).) Recognizing that counsel frequently may not be available to prepare a comprehensive petition for a writ of habeas corpus in capital cases, we further clarify that filing a limited-purpose petition addressing only RJA claims does not jeopardize the ability to later bring any other challenges to a capital conviction or sentence that appellants may wish to raise once they have the assistance of counsel appointed to develop and present a comprehensive habeas petition. (See *In re Friend* (2021) 11 Cal.5th 720, 732.)

We recognize that even when there is no legal impediment to pursuing RJA claims while an appeal remains pending, there may be practical reasons in a particular case why the usual appellate process must be altered to ensure timely and effective access to RJA remedies. Here, however, Wilson has not shown that delaying the resolution of this appeal is necessary to afford him a full, fair, and timely opportunity to litigate his RJA claims in superior court. We therefore deny his motion to stay the appeal and to order a limited remand.

## A. The California Racial Justice Act

The Legislature passed the RJA in 2020 with a stated aim "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).) To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin. (Pen. Code, § 745, subd. (a).)

The central provision of the RJA, Penal Code section 745 (section 745), provides that a defendant may establish a violation of the Act by proving by a preponderance of the evidence that one of the following occurred: "(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited [racial] bias or animus towards the defendant"; or "(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language . . . or otherwise exhibited [racial] bias or animus towards the defendant . . . , whether or not purposeful." (§ 745, subd. (a)(1), (2).) Alternatively, defendants may establish a violation of the Act by showing, by a preponderance of the evidence, that they were charged or convicted of a more serious offense than defendants of other races who are similarly situated, or that they received a longer or more severe sentence by nature of their race, or the race of their victim. (*Id.*, subd. (a)(3), (4).) A defendant may request disclosure of evidence relevant to these claims, and the trial court shall order disclosure upon a showing of good cause. (*Id.*, subd. (d).)

The RJA also amended section 1473, which identifies bases for prosecuting a petition for writ of habeas corpus, to add a subdivision governing the litigation of RJA claims. The added subdivision allows a petition for a writ of habeas corpus "after judgment has been entered based on evidence that a criminal conviction or sentence was sought, obtained, or imposed in violation of subdivision (a) of Section 745." (§ 1473, subd. (e) (section 1473(e)).) Section 1473(e) provides for the appointment of counsel "if the petitioner cannot afford counsel and either the petition alleges facts that would establish a violation of subdivision (a) of Section 745 or the State Public Defender requests counsel be appointed." Newly appointed counsel may also amend a petition filed before their appointment. (*Ibid.*) Under section 1473(e), a petition raising an RJA claim for the first time, or on the basis of new evidence, may not be deemed a successive or abusive petition.

The statute also provides that if a habeas petition makes a prima facie showing of entitlement to relief under the Act, the trial court must issue an order to show cause and hold an evidentiary hearing. (§ 1473(e).) Likewise, if "a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing." (§ 745, subd. (c).) If, after a hearing, the court finds a violation of section 745, subdivision (a) by a preponderance of the evidence, the court "shall impose a remedy specific to the violation." (*Id.*, subd. (e).) "Before a judgment has been entered," a court may remedy a violation of the Act by declaring a mistrial, empaneling a new jury, dismissing enhancements or special circumstances or allegations, or reducing one or more charges. (*Id.*, subd. (e)(1)(A), (B), (C).) "After a judgment has been entered," the remedies depend on the nature of the

violation but include vacating the sentence and conviction and ordering further proceedings. (*Id.*, subd. (e)(2)(A), (B).) In addition, section 745, subdivision (e)(3) provides that, subject to exceptions, "[w]hen the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty."

When it was first passed, the RJA applied only prospectively, to cases in which judgment had not yet been entered as of the Act's effective date of January 1, 2021. (§ 745, former subd. (j).) But in 2022, the Legislature extended the Act to additional categories of cases, effective at various points over the next several years. (Assem. Bill No. 256 (2021–2022 Reg. Sess.); Stats. 2022, ch. 739, § 2.) As relevant here, the 2022 amendments made the Act immediately applicable to all cases in which judgment is not final (§ 745, subd. (j)(1)), as well as "to all cases in which, at the time of the filing of a petition pursuant to subdivision [(e)] of Section 1473 raising a claim under this section, the petitioner is sentenced to death . . . , regardless of when the judgment or disposition became final" (*id.*, subd. (j)(2)).[13] The 2022 amendments also added a new

---

[13] Beginning January 1, 2024, the Act applies to all cases in which the petitioner is currently serving a sentence for felony or juvenile offenses "regardless of when the judgment or disposition became final" (§ 745, subd. (j)(3)); beginning in 2025, to all cases in which judgment became final for a felony conviction or juvenile disposition that "resulted in a commitment to the Division of Juvenile Justice on or after January 1, 2015" (*id.*, subd. (j)(4)); and beginning in 2026, to all cases in which "judgment was for a felony conviction or juvenile disposition that resulted in a commitment to the Division of Juvenile Justice, regardless of when the judgment or disposition became final" (*id.*, subd. (j)(5)).

subdivision (k), which provides that for petitions that are filed in cases in which judgment was entered before January 1, 2021, the state may show that a violation of section 745, subdivision (a)(1) or (2) — the provisions concerning exhibitions of discrimination or bias, including use of language that explicitly or implicitly appeals to bias — was harmless beyond a reasonable doubt.  (§ 745, subd. (k).)

In 2023, the Legislature further amended the RJA to provide additional guidance about how an RJA claim may be raised.  As originally enacted, section 745, subdivision (b) provided that a "defendant may file a motion in the trial court or, if judgment has been imposed, may file a petition for writ of habeas corpus or a motion under Section 1473.7[14] in a court of competent jurisdiction, alleging a violation of subdivision (a)." As amended by Assembly Bill No. 1118 (2023–2024 Reg. Sess.) (Assembly Bill 1118), which became effective on January 1, 2024, the statute now specifies that a defendant "may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a).  For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence.  The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section."  (§ 745, subd. (b).)

---

[14]     Penal Code section 1473.7 allows a person who is no longer in custody to file a motion to vacate a conviction or sentence.

**B. Wilson's Motion**

Wilson asks this court to stay his direct appeal and remand his case to the superior court, where he intends to develop and present non-record-based RJA claims.

Wilson outlines two potential claims. First, Wilson, who is Black, says that his defense investigator learned that during penalty phase deliberations one of the jurors referred to mitigating evidence of abuse and neglect in Wilson's background as " 'cultural.' " In the presence of other jurors, she argued that many children in Black families were raised under similar conditions and did not go on to commit murder. Wilson represents that he intends to present this evidence of the juror's comments, as well as lay and expert evidence to show that these comments violated the RJA's prohibition on racially discriminatory language (§ 745, subd. (a)(2)), and to establish that the juror exhibited racial bias or animus toward Wilson by implying that jurors should discount the weight of Wilson's mitigation because of his race (*id.*, subd. (a)(1)).

Second, Wilson asserts that there are significant racial disparities in both charging and sentencing in San Bernardino, his county of conviction. He contends that he will be able to show good cause for disclosure of additional evidence to prove a violation of the RJA based on racially disproportionate practices related to his charging, conviction, and sentence. (§ 745, subd. (a)(3), (4).)

**C. Discussion**

Wilson's request for a stay and remand relies on Penal Code section 745, subdivision (b), as it was recently amended during the pendency of his motion. The present version provides that a defendant "may . . . move to stay the appeal and request

remand to the superior court to file a motion pursuant to this section." (§ 745, subd. (b).)  But as Wilson acknowledges, while the statute permits the filing of a stay-and-remand motion, the statute does not specify the standards for deciding whether the motion should be granted.  The central question we confront here concerns that issue.  To answer that question, we begin by providing a brief overview of the relevant legal background.

### 1. *Legal background related to the stay-and-remand procedure*

Section 745 provides three vehicles by which a defendant may raise an RJA claim.  The defendant may raise an RJA claim by motion (§ 745, subd. (b); see also, e.g., *id.*, subd. (c) [laying out procedure for litigating a motion "filed in the trial court"]); may raise an RJA claim on direct appeal from the conviction or sentence, provided the claim is based on the trial record (*id.*, subd. (b)); or may raise an RJA claim in a petition for writ of habeas corpus (*ibid.*; see § 1473(e)).  A petition for habeas corpus is, as this court has frequently noted, the standard vehicle for developing and presenting claims of error in the judgment based on evidence outside the appellate record — as Wilson seeks to do here.  (E.g., *People v. Romero* (1994) 8 Cal.4th 728, 736–737.)

With the Assembly Bill 1118 amendments to section 745, subdivision (b) the Legislature did not create a new vehicle for raising RJA claims.  Instead, evidently aware that "questions have been raised as to whether habeas petitions are the exclusive avenue for a post-conviction RJA challenge" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended Mar. 15, 2023, p. 6), the Legislature clarified that other types of post-judgment filings are also, in some cases, permissible.  As relevant here, the Legislature clarified that defendants may seek to invoke a stay-

and-remand procedure that appellate courts had recently developed and employed in other contexts, where appropriate to enable an individual with a pending, as-yet-unadjudicated appeal to return to superior court to pursue statutory resentencing or similar alternative relief under newly enacted ameliorative criminal laws.

The stay-and-remand procedure derives in the first instance from the authority to order a limited remand under Penal Code section 1260 (section 1260). Section 1260, by its terms, confers authority on appellate courts to "remand the cause to the trial court for such further proceedings as may be just under the circumstances." As we explained in *People v. Braxton* (2004) 34 Cal.4th 798, this authority includes the authority to order a limited remand "to allow the trial court to resolve one or more factual issues affecting the validity of the judgment but distinct from the issues submitted to the jury, or for the exercise of any discretion that is vested by law in the trial court." (*Id.* at pp. 818–819.)

But typically when a court orders a remand — limited or otherwise — it does so to permit further proceedings concerning an issue raised on appeal, as part of its resolution of that appeal. (§ 1260 [describing available rulings to resolve an appeal]; see, e.g., *People v. Braxton*, *supra*, 34 Cal.4th at p. 819 [concluding that the trial court had improperly refused to hold a hearing on defendant's motion for a new trial and ordering a limited remand for purposes of holding such a hearing].) In those circumstances, the remittitur issues and " 'the trial court is revested with jurisdiction of the case' " to carry out the judgment as ordered by the appellate court. (*People v. Picklesimer* (2010) 48 Cal.4th 330, 337.)

The stay-and-remand procedure to which Wilson refers, by contrast, involves a remand that delays resolution of an appeal. This stay-and-remand procedure is a relatively recent innovation, developed in recent years in response to the enactment of a number of criminal justice reforms that have created alternative pathways to relief outside the usual appellate process. (See, e.g., Pen. Code, § 1172.6 [establishing a procedure to vacate convictions that were based on the natural and probable consequences doctrine]; Sen. Bill No. 1437 (2017–2018 Reg. Sess.); Stats. 2018, ch. 1015, § 4.) Confronted with questions about how to create effective access to these new statutory pathways to relief, appellate courts have recognized that in some situations there may be good cause to put the appeal on hold and remand the case to the trial court to permit appellants to pursue effective relief made newly available by statute.

The stay-and-remand approach was first applied in *People v. Awad* (2015) 238 Cal.App.4th 215. In that case, defendant Awad sought to raise a claim under Proposition 47, legislation that reclassified certain felonies as misdemeanors, after he had already filed an appeal of the criminal judgment against him. (*Awad*, at p. 218.) Under the new law, eligible offenders could file a petition in the trial court for recall of the sentence and resentencing according to the amended guidelines. (Pen. Code, § 1170.18.) Because the alternate misdemeanor sentence was relatively short, Awad could only take advantage of the early release resentencing might afford if a court acted quickly on his petition for recall and resentencing. Delay in the process would mean that Awad was effectively serving the longer felony sentence, even if it were no longer applicable to his offense. When Awad filed his Proposition 47 petition, however, the trial

court concluded that it lacked jurisdiction to address the petition while Awad's case remained pending on appeal. (*Awad*, at p. 218.) If Awad waited until his appeal was final to pursue his petition in the trial court, he would lose the benefit of the shortened sentence. But to benefit from the shortened sentence, Awad would have to give up his appeal so that the trial court could exercise jurisdiction over his petition. Under these circumstances, the appellate court held that a discretionary stay and remand pursuant to section 1260 was appropriate to avoid this "jurisdictional conundrum." (*Awad*, at p. 218.) The Court of Appeal explained that it would "construe Proposition 47 together with section 1260 to authorize a limited remand to the trial court to hear a postconviction motion to recall a sentence under section 1170.18. ' " 'The . . . power arises from necessity where, in the absence of any previously established procedural rule, rights would be lost.' " ' " (*Id.* at p. 222.)

Since *Awad*, the stay-and-remand procedure has gained general acceptance in our courts. In *People v. Martinez* (2019) 31 Cal.App.5th 719, for instance, the court discussed the possibility of granting a stay and remand in cases involving a different criminal justice reform measure, Senate Bill No. 1437 (2017–2018 Reg. Sess.), which narrowed the scope of the felony murder rule and eliminated murder liability under the natural and probable consequences doctrine. (*Martinez*, at p. 729.) Similar to the law in *Awad*, Senate Bill No. 1437 provided that eligible individuals may gain relief by filing a petition in the trial court to have their conviction vacated and to be resentenced. (Pen. Code, § 1172.6, subds. (a), (d)(3), (e) [formerly Pen. Code, § 1170.95].) The court recognized that some individuals with nonfinal cases might have reason to immediately invoke the statutory procedures of Penal Code

section 1172.6, and to pursue the relief created by Senate Bill No. 1437 without first waiting for the completion of their direct appeal. (*Martinez*, at p. 729.) The court remarked that if supported by good cause, a reviewing court could order a stay and limited remand to allow the trial court to rule on a petition invoking the benefits of the new legislation. (*Ibid.*; accord, *People v. Cervantes* (2020) 46 Cal.App.5th 213, 226.)

Responding to concerns about unnecessary delay in resolving petitions under Penal Code section 1172.6, this court, too, has pointed to the possibility that an appellate court may grant a motion to stay the appeal and order a limited remand to the superior court "where good cause supports the motion." (*People v. Gentile* (2020) 10 Cal.5th 830, 858.)

We presume that when the Legislature added the stay-and-remand language now found in section 745, subdivision (b), it meant to draw on the procedure employed in *Awad* and discussed in other cases, under which a court may find good cause to stay a pending appeal and remand the case to the trial court to permit the appellant to pursue alternative forms of relief. (See *People v. Frahs* (2020) 9 Cal.5th 618, 634 ["the Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' "].) The legislative history bears this out. Addressing the provision in its analysis of Assembly Bill 1118, the Assembly Committee on Public Safety explained that although a trial court generally loses jurisdiction once an appeal is filed, a stay-and-remand procedure had been permitted by courts in other post-judgment relief contexts. The committee referred specifically to *Martinez*'s observation that an appellate court could order a stay and limited remand if the court finds good cause to do so. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1118,

*supra*, as amended Mar. 15, 2023, p. 6.)  The committee noted that a stay and remand "may be necessary" under the RJA "to permit the trial court to rule on the claim in the first instance, and to allow the parties to fully litigate the issue." (*Ibid.*)

Although it relied on an existing procedure developed to effectuate other remedial legislation, the Legislature also indicated that it meant for the availability of the stay-and-remand procedure to serve the specific concerns of the RJA.  The Legislature envisioned that the stay-and-remand procedure would "ensure that the basic civil rights protections provided by the RJA can be accessed in an efficient and effective manner" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 9), and would help to address problems arising in that context, such as the shortage of qualified habeas counsel in capital cases (see *id.*, p. 6 [a stay and remand is important to capital litigants who lack access to qualified habeas counsel]).

With this background in mind, we infer that when the Legislature referred to motions for a stay and remand in section 745, subdivision (b), it intended that RJA litigants would be able to address concerns specific to the RJA by invoking the procedure courts have developed in other contexts to facilitate prompt adjudication of alternate claims of relief where there is good cause to deviate from the usual course of appellate adjudication.  The parties do not dispute this premise.  Their disagreement instead centers on what constitutes good cause for a stay and remand in the RJA context.  We turn to that subject next.

## 2. *Whether there is good cause for a stay and remand*

As noted, Wilson's primary argument is that good cause is necessarily established, and a stay and remand required, whenever a defendant raises a plausible claim that an RJA violation could or might have occurred. Wilson contends the standard for finding good cause for a remand that delays final adjudication of the appeal is the same standard the court in *Young v. Superior Court* (2022) 79 Cal.App.5th 138 adopted for determining when a defendant has shown good cause to obtain discovery under the RJA. Drawing on the standard for obtaining discovery of law enforcement personnel records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, the court held that to show "good cause" for discovery under the RJA, "a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act 'could or might have occurred' in his case." (*Young*, at p. 159.) This standard for obtaining discovery, the court concluded, "should not be difficult to meet." (*Id.* at p. 161.) Here, Wilson contends — and the dissent agrees (dis. opn. of Evans, J., *post*, at p. 7.) — that this court should stay his appeal and order a remand for RJA proceedings because he has " 'advance[d] a plausible factual foundation, based on specific facts, that a violation of the Racial Justice Act "could or might have occurred" in his case.' "

The Attorney General counters that the standard for finding good cause to order discovery in an RJA case is not an appropriate standard for determining whether there is good cause to delay the final resolution of an appeal of a criminal judgment. In the Attorney General's view, it is not enough merely to identify a plausible claim under the RJA; the question should instead be "whether the balance of the competing

interests weighs in favor of granting or denying a stay or a limited remand." The Attorney General invokes as an analogy the standard for deciding whether to stay civil proceedings for a parallel criminal proceeding, which involves considering " ' " 'the particular circumstances and competing interests involved in the case' " ' " and factors such as prejudice to the party opposing the stay, the burden on the party seeking a stay, convenience and efficiency for the court, nonparty interests, and the public's interest in the pending civil and criminal litigation. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 483.)

We agree that the good cause inquiry is not limited to whether the defendant seeks to litigate a colorable claim in an alternative forum, but instead takes into account all relevant circumstances and interests that counsel for and against a stay of appellate proceedings while that litigation occurs. A stay and remand is a significant departure from the usual process of adjudication and carries with it significant risks of disruption and delay. For that reason, courts have uniformly understood that good cause must be based on the particular circumstances and interests at stake. The fact that an appellant may have other, colorable claims that could be raised in a different forum has never been thought sufficient, standing alone, to justify halting the adjudication of a pending appeal.

Section 745, subdivision (b) contains no indication that the Legislature intended to prescribe a different approach. The amended version of the provision simply makes clear that a defendant "*may* also move to stay the appeal and *request* remand to the superior court." (Pen. Code, § 745, subd. (b), italics added.) The reference to requesting a stay and remand is not plausibly read as an implicit command to automatically grant such a request whenever the defendant intends to raise

an RJA claim that is not obviously deficient on its face.[15]  Such a system of virtually automatic stays would not only run counter to existing law concerning the stay-and-remand approach, but would also significantly impinge on courts' " 'inherent power to control litigation before them.' "  (*In re Reno* (2012) 55 Cal.4th 428, 522.)  If the Legislature intended to prescribe such a result, it "would have done so explicitly" (*People v. Bright* (1996) 12 Cal.4th 652, 668), rather than simply referring in general terms to defendants' ability to request a stay and remand (§ 745, subd. (b)).

To the extent the language of the statute admits of any doubt on this point, the legislative history contains no indication that section 745, subdivision (b) was intended to curtail courts' traditional ability to consider all relevant circumstances in determining whether to grant an appellate stay.  As noted, it is clear the Legislature was aware of the stay-and-remand procedure as it had been invoked in recent cases involving post-

---

[15]  The dissent questions why the Legislature would include an explicit reference to motions for stay and remand if not to create a procedure specific to the RJA.  (Dis. opn. of Evans, J., *post*, at pp. 7–8.)  But the statutory reference does not, by its terms, create any procedure at all; it merely refers to a defendant's ability to file a motion for stay and remand — language that, as noted, is naturally understood to invoke the stay-and-remand procedure developed in *Awad* and subsequent cases.  The reasons for including this reference are not difficult to discern; before the 2023 amendments, it was unclear whether *any* appellant could *ever* raise post-judgment RJA claims by any means other than a habeas petition.  The amendments made clear that post-judgment claimants may seek to invoke other generally available procedures, including both direct appeal and motions for stay and remand, to the extent those procedures are appropriate to the circumstances.

judgment access to ameliorative changes in the law. The courts in these cases never suggested that a stay and remand should be granted as a matter of course; they instead recognized that a range of practical considerations are relevant to the decision. The legislative history contains no indication the Legislature expected courts considering RJA claims to depart from this approach. On the contrary, a cosponsor of the amendments to section 745, subdivision (b) stated that Assembly Bill 1118 enacts "narrow, technical reforms" and merely "clarifies" the ability to raise RJA claims on appeal or to request a stay and remand. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 9.) Nothing in the history suggests the Legislature instead intended dramatic changes to the way courts have typically determined whether good cause exists to stay a pending appeal and send the case to superior court for the institution of an alternative proceeding.

The plausibility of Wilson's RJA claims is certainly a relevant consideration: Whether defendants are potentially eligible for the benefits they seek to pursue on remand is an important threshold consideration in determining whether there is good cause to grant a request for a stay and remand. (Cf. *People v. Awad*, *supra*, 238 Cal.App.4th at p. 221 [noting that defense counsel represented that Awad was eligible for Prop. 47 resentencing].) But it is not the only consideration relevant to the good cause inquiry. As courts have recognized in other contexts, a court must consider whether there are unusual circumstances that give rise to pressing concerns warranting a departure from the usual conduct of an appeal — such as the necessity of preserving a defendant's rights under newly enacted laws and the importance of alleviating delay in accessing potentially significant benefits, as in *Awad* — as well as

competing concerns of delay and unnecessary disruption in the resolution of claims properly presented on appeal.

This inquiry also takes into account the nature of the rights involved. The central purpose of the RJA is to provide meaningful remedies for proven racial discrimination in the administration of criminal justice, and thus to eliminate racial bias in California's criminal justice system. And through the amendments to the statute, the Legislature has made clear the importance of ensuring " 'efficient and effective' " access to these remedies. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 6; see also Assem. Conc. Sen. Amends. to Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 1.)

Mindful of the overriding purposes of the RJA, our good cause inquiry begins by considering whether Wilson seeks to raise a plausible RJA claim. He does. We thus proceed to examine whether Wilson has shown that a stay and remand may be needed to ensure that he is able to litigate those claims in a timely manner, and thus has timely and effective access to the remedies the RJA makes available for proven racial discrimination in the administration of criminal justice. Finally, we consider other circumstances relevant to the existence of good cause.

### a. Wilson's access to RJA remedies

We turn, then, to the circumstances relating to Wilson's access to RJA remedies. At the outset, we observe that this case differs in an important respect from other cases in which courts have employed the stay-and-remand procedure. In those cases, the courts were confronted with a particular jurisdictional

dilemma: So long as an appeal remained pending, the trial court lacked jurisdiction to evaluate the defendant's eligibility for resentencing relief under a newly enacted ameliorative statute. The courts concluded that this dilemma established good cause: Employing the stay-and-remand procedure provided a way around the problem, permitting prompt resolution of the defendant's entitlement to alternative forms of relief in circumstances where prompt resolution was needed to adequately secure the defendant's statutory rights. (See *People v. Awad, supra*, 238 Cal.App.4th at p. 222 [preventing the loss of rights justified a stay and remand].)

This case poses no similar timing dilemma, for, as we now clarify, there is no legal obstacle preventing Wilson and other defendants in his position from simultaneously pursuing relief through a direct appeal and relief in the superior court through a petition for writ of habeas corpus. The RJA, as we read it, draws on settled principles in the habeas context to afford defendants whose RJA claims are independent of the claims on appeal a timely opportunity to raise extrarecord RJA claims without regard to the status of proceedings on appeal.

We begin with settled principles. Again, as we have noted, the standard vehicle for developing and presenting claims of error in the judgment based on evidence outside the appellate record — as Wilson seeks to do here — is a petition for a writ of habeas corpus. (§ 1473, subd. (a); *People v. Romero, supra*, 8 Cal.4th at pp. 736–737.) A habeas petition comes within a trial court's original jurisdiction under article VI, section 10 of the California Constitution. (See *In re Figueroa* (2018) 4 Cal.5th 576, 586.) But as we explained in *In re Carpenter* (1995) 9 Cal.4th 634, this jurisdiction can coexist with an ongoing appeal: "Nothing in article VI, section 10, or any other provision of law,

denies the superior court of subject matter jurisdiction over habeas corpus proceedings when the challenged judgment is pending on appeal before an appellate court or even when, as here, a judgment of death is pending on automatic appeal before this court." (*Id.* at p. 646.)

This sort of concurrent jurisdiction is, of course, limited in that the trial court "does not have 'the power to interfere with the appellate jurisdiction of either [this court or the Court of Appeal] in matters pending before said appellate courts.' " (*In re Carpenter*, *supra*, 9 Cal.4th at p. 646.) But a trial court ordinarily does not interfere with appellate court jurisdiction when it entertains a request for relief based on arguments and evidence outside the appellate record. In *Carpenter*, for example, we concluded there was no such interference when the habeas corpus claim before the superior court involved juror misconduct that did not appear in the record. (*Ibid.*) We explained that because "[a]ppellate jurisdiction is limited to the four corners of the record on appeal," we could not consider the misconduct claim "[i]n the exercise of our appellate jurisdiction." (*Ibid.*; cf. *People v. Mayfield* (1993) 5 Cal.4th 220, 225 [trial court lacked jurisdiction to grant a habeas petition on the same issue that had been adversely decided on the record on appeal].) This conclusion was based on a long-standing understanding of the law (e.g., *France v. Superior Court* (1927) 201 Cal. 122, 132 [superior courts may not exercise their concurrent habeas jurisdiction "on any ground appearing upon the face of the record on appeal"]; *In re Baker* (1988) 206 Cal.App.3d 493, 500 ["the trial court was free to determine the [ineffective assistance of counsel claim], irrespective of the pendency of the appeal" because neither proceeding would interfere with the other]), and remains in force (see *Robinson v. Lewis* (2020) 9 Cal.5th 883,

901–902 ["Petitioners challenging a state court judgment by means of a petition for a writ of habeas corpus that is not related to a pending direct appeal should first file the petition in the superior court that rendered the judgment"]; *People v. Scarbrough* (2015) 240 Cal.App.4th 916, 927 ["where a writ of habeas corpus relies on evidence outside the record, it may be considered by the superior court despite a pending appeal"]; Levenson, Cal. Criminal Procedure (The Rutter Group 2023) § 30.21, p. 627 ["The superior court is not denied subject matter jurisdiction over habeas corpus proceedings when the challenged judgment is pending on appeal before an appellate court"]).

The RJA makes use of this concurrent path to relief by providing that claims under the Act may be initiated by a petition for a writ of habeas corpus. (§ 1473(e).) And here, much as in *Carpenter*, Wilson intends to raise new claims not raised on appeal, based on evidence outside the appellate record. Indeed, his first proposed RJA claim is much like the claim in *Carpenter*, concerning evidence of potential juror misconduct unearthed after the judgment; his second claim involves racially disparate charging and sentencing, which again depends on discovery and litigation concerning charging and sentencing practices that are entirely outside the appellate record. Under this court's precedent, there is no bar to his bringing these claims in a habeas petition in the superior court while his direct

appeal is pending.[16] He does not need a stay of the appeal or a remand to the superior court to raise them.[17]

Although Wilson acknowledges settled precedent permitting concurrent jurisdiction in the habeas context, he notes that there is "an insurmountable backlog" of capital cases awaiting the appointment of habeas counsel. He argues that without any "realistic prospect for the appointment of habeas counsel," he would be left with no timely way of raising his RJA claims by way of a concurrent habeas petition. He asserts that a stay and remand, which would allow him to present a post-judgment RJA motion in the trial court before the final resolution of his appellate claims, is necessary to overcome this problem.

---

[16] Because we are resolving Wilson's direct appeal, his judgment likely will soon become final. To be clear, nothing we say today prevents individuals with final judgments from seeking the appointment of counsel and pursuing RJA claims in habeas proceedings in the superior court as envisioned by the Act. (E.g., § 745, subd. (j)(2), (3) [establishing the timing for filing an RJA habeas petition "regardless of when the judgment or disposition became final"]; § 1473(e) [providing for the appointment of counsel and prosecution of a writ of habeas corpus "after judgment has been entered"].)

[17] Wilson contends that *Carpenter* illustrates the possibility that a concurrent habeas proceeding will not expedite resolution of extrarecord RJA claims. In that case, the absence of a certified appellate record prevented this court from conducting the necessary prejudice inquiry to resolve Carpenter's concurrent juror misconduct claim raised on habeas. (*In re Carpenter*, *supra*, 9 Cal.4th at p. 659.) Here, the appellate record has been certified for quite some time and, at any rate, it is not clear how a stay and remand would avoid any hypothetical problems in the preparation of a certified appellate record.

The concern Wilson raises is significant.[18] Although an indigent person sentenced to death is entitled to the appointment of counsel for state post-conviction proceedings (Gov. Code, § 68662; Pen. Code, § 1509 (section 1509)), there are, as Wilson indicates, substantial delays in appointing counsel under this authority to develop and present a comprehensive collateral attack on Wilson's death judgment. This was true eight years ago, when voters passed Proposition 66, the Death Penalty Reform and Savings Act of 2016 (Gen. Elec. (Nov. 8, 2016) § 1) (Proposition 66), which transferred appointment authority from this court to the superior courts. (*Briggs v. Brown* (2017) 3 Cal.5th 808, 864 (*Briggs*) (conc. opn. of Liu, J.).) There is no indication that the situation has improved, and Wilson cites data indicating that it has worsened. (See also *ibid.* [acknowledging the possibility that Prop. 66 could exacerbate the shortage of capital habeas counsel].)

But the Legislature contemplated a process for appointment of counsel to raise RJA claims that is distinct from the process for appointing counsel "in proceedings pursuant to Section 1509 of the Penal Code" (Gov. Code, § 68662, subd. (a)) to prepare a comprehensive capital habeas petition. The representation that superior courts must order pursuant to Government Code section 68662, the qualifications for such counsel (see *id.*, § 68665 [directing the adoption and reevaluation of competency standards]; Cal. Rules of Court, rule 8.652 [counsel qualifications]), and additional procedures for

_____

18 It is a concern relevant not only to Wilson and other similarly situated appellants who might seek a stay and remand, but also to those capital defendants whose judgments are already final, and whose only avenue for raising their RJA claims is therefore by way of habeas proceedings.

those appointments (Cal. Rules of Court, rule 4.561) pertain to capital petitions governed by section 1509, as adopted or amended as part of Proposition 66. (See, e.g., *Briggs*, *supra*, 3 Cal.5th at p. 824 [describing Prop. 66 requirements for Judicial Council competency standards and the appointment of counsel by the superior courts].)

The RJA authorizes defendants to raise RJA claims through the same mechanism contained in section 1509 (that is, a petition for writ of habeas corpus), but it does not import all of the same provisions governing the appointment of counsel. Rather, the RJA contains its own counsel appointment provision. (§ 1473(e).) Thus, notwithstanding the various provisions of Proposition 66, the Attorney General does not dispute that capital petitioners may file limited-purpose RJA petitions with counsel appointed pursuant to section 1473(e), and we agree. There is no evident reason why the RJA's counsel provision should not be given full effect, even in capital cases governed by Proposition 66. A petition addressed specifically to RJA claims, with counsel appointed pursuant to the procedures specified in the RJA, is not inconsistent with Proposition 66's overarching aim of promoting the efficient resolution of challenges to capital sentences. (See generally *Briggs*, *supra*, 3 Cal.5th at pp. 823–825 [describing purposes underlying Prop. 66].) In other words, a defendant need not necessarily await the appointment of counsel available to assist with a full capital habeas petition; the defendant may file a post-judgment RJA petition with the assistance of counsel appointed pursuant to section 1473(e) for that specific, limited purpose.

Wilson suggests limited-scope RJA representation is not viable because of the risk of procedural default. He asserts that if he were to file a petition raising only RJA claims under section

1473, he would thereby be prevented from later raising other habeas claims, presumably after the appointment of capital habeas counsel, by the bar on successive petitions. As Wilson notes, present statutory law provides that a "successive" petition for a writ of habeas corpus challenging a judgment of death "shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence." (§ 1509, subd. (d).) But as we recently explained, the purpose of this successiveness bar, like preexisting successiveness bars developed through case adjudication, is simply to prevent abuse of the writ process through repetitive or piecemeal claims; it is not to bar the filing of claims that, through no fault of the petitioner's, could not feasibly have been raised in an earlier petition. (*In re Friend*, *supra*, 11 Cal.5th at p. 732.) Rather, "the filing of a claim that could not have reasonably been raised in an earlier petition" is *not* "an abuse of the writ subject to the bar on successive petitions." (*Ibid*.; *id*. at p. 741.)

When the appointment of capital habeas counsel marks petitioners' first opportunity to raise comprehensive challenges to their convictions or death sentence on bases other than the RJA, such challenges are not barred as successive. (See *In re Friend*, *supra*, 11 Cal.5th at p. 724.) This conclusion follows from settled law. A petitioner entitled to the appointment of capital habeas counsel "is entitled to rely on that attorney to conduct a reasonable investigation and, if appropriate, present viable claims in a single petition." (*In re Sanders* (1999) 21 Cal.4th 697, 720.) As a consequence, "the actions (or inactions) of appointed counsel are relevant to deciding whether the

107

procedural rule against successive habeas corpus petitions is applicable." (*Ibid*.) In *Sanders*, we addressed a different procedural bar — delay — and concluded that bar did not apply when appointed counsel had abandoned the petitioner. (*Ibid*.) Similar reasoning applies to the scenario Wilson presents: Where the scope of appointed counsel's representation is limited to RJA claims, the need to present other claims in a subsequent petition, following the appointment of capital habeas counsel, arises "*through no fault of the prisoner*." (*Id.* at p. 721; see also *People v. Superior Court (Morales)* (2017) 2 Cal.5th 523, 533 ["our inability to timely appoint habeas corpus counsel in capital cases should not operate to deprive condemned inmates of a right otherwise available to them"].) Because the subsequent non-RJA claims in those circumstances "could not have reasonably been raised" in an earlier petition (*In re Friend*, at p. 741), they do not trip on the successiveness bar.[19]

Wilson also contends that even if appellants are entitled to file limited-purpose RJA petitions, there is no guarantee that qualified habeas counsel will be available to represent them. We acknowledge the importance of this concern. The same concern is also reflected in the legislative history, which indicates that the stay-and-remand procedure could be "particularly important for individuals with death sentences . . . [who are] unlikely to have habeas attorneys assigned to them due to the unavailability of qualified counsel, making it nearly impossible to litigate their RJA claims in a timely fashion." (Sen. Com. on

---

[19] The Attorney General agrees that a successiveness bar would not apply and has confirmed that he would not invoke it in these circumstances.

Public Safety, Analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 6.)

But Wilson has not shown this concern is present in his own case. Wilson is represented by the Office of the State Public Defender (OSPD), which has indicated that it is willing to continue to represent Wilson in developing and presenting extrarecord RJA claims. Although Wilson would prefer this to occur through an RJA motion adjudicated while the final resolution of the appeal is stayed,[20] he has not shown that OSPD would be unavailable to litigate his claims if they were to be raised instead through a limited-purpose habeas petition addressed exclusively to RJA claims. As for counsel's qualifications, Wilson notes that there are specific requirements for capital habeas representation — set out in California Rules of Court, rule 8.652 — and that if applicable, those qualification requirements would constrain the appointment of counsel for capital RJA claimants generally. But as Wilson acknowledges, it is not clear the same qualification requirements apply to a limited-purpose filing under the RJA. (See Pen. Code, § 1473.1 [standards for the appointment of counsel to pursue RJA claims in capital cases must be "consistent with" existing standards].)

---

[20] Wilson argues that it would be preferable to proceed through motion in superior court, in part because then his RJA claims would not be subject to harmless error review, as are "petitions" raising RJA claims. (§ 745, subd. (k).) The Attorney General contends, however, that the RJA authorizes harmless error review for both petitions and motions. We need not, and thus do not, resolve this dispute here.

In any event, even if those qualification requirements were applicable, Wilson's counsel would indisputably meet them.[21]

Wilson argues that the mechanism for appointing habeas counsel for RJA petitioners is "at best, unclear" and asserts that allowing capital appellants to pursue RJA claims following an appellate stay and remand will generally be "much faster than waiting for the appointment of capital habeas counsel."  Wilson does not, however, point to difficulties that will arise in his own case; that is, he does not argue that the RJA appointment mechanism is inadequate to ensure prompt appointment of his existing counsel to initiate limited-purpose habeas proceedings. (See § 1473(e) [requiring the appointment of counsel to pursue

---

[21]    As Wilson acknowledges, OSPD has been appointed for both appellate and habeas proceedings in the past and currently represents capital habeas clients.

The California Appellate Project, as amicus curiae in support of the OSPD, raises concerns about the effect of qualification requirements on the appointment of limited-scope, RJA habeas counsel for capital appellants who are not represented by OSPD.  This issue is beyond the scope of our decision today.  The parties have not addressed the question and, as explained above, it is not directly at issue in this case.  Under the circumstances, the better course is to address the matter after the parties have had an opportunity to consider, brief, and argue the relevant issues in a case that presents them and requires their resolution.  (See *In re D.P.* (2023) 14 Cal.5th 266, 276 [reiterating the obligation to avoid ruling on " ' "abstract propositions" ' "].)  For present purposes, it suffices to observe that it is not clear that the same qualification and appointment requirements apply to RJA habeas counsel as have been implemented for comprehensive capital habeas representation governed by section 1509 and other Proposition 66 provisions.

an RJA petition if either the petitioner alleges facts that would establish a violation of the RJA, or at the request of OSPD].)

In sum, Wilson has not demonstrated that any legal or practical obstacle will delay or prevent him from raising his extrarecord RJA claims through the usual means of a petition for writ of habeas corpus. He thus has not shown that a stay of the adjudication of his appeal is necessary to afford him timely and effective access to RJA remedies.[22]

### b. *Other relevant considerations*

To determine whether a stay and remand is warranted, we must also consider the interests on the other side of the balance. The RJA proceedings Wilson seeks to pursue are potentially quite involved, and as such would cause significant delay in the resolution of his appeal. (Cf. *People v. Awad*, *supra*, 238

---

[22] The dissent raises a number of possible practical concerns that may arise in other cases. Among other things, the dissent questions the funding available for RJA habeas counsel and suggests that it may be more difficult for the superior courts to resolve RJA claims raised in a limited-purpose habeas petition than to resolve them in a filing denominated a "motion." The dissent also envisions an untenable burden on OSPD if it assumes an obligation to represent all of its current and former clients in limited-purpose RJA habeas proceedings. (Dis. opn. of Evans, J., *post*, at pp. 13, 17–18.)

Our holding today does not preclude litigants from raising such concerns in future cases. As the dissent notes, our consideration of Wilson's stay-and-remand request "necessarily depends on the specific circumstances of the case and context." (Dis. opn. of Evans, J., *post*, at p. 8.) In this particular case, Wilson has not pointed to any concrete obstacles to his own development and presentation of RJA claims in a habeas proceeding. We presume that Wilson and his counsel are best positioned to identify matters of concern regarding Wilson's own case.

Cal.App.4th at pp. 224–225 [the hearing for Awad's uncontested petition was estimated to require 15 minutes, a relevant factor in favor of the stay and remand].) Wilson states that he will present evidence from both lay and expert witnesses in support of his claim of juror misconduct. He also indicates he will seek discovery under section 745, subdivision (d), to obtain information to show the disproportionate imposition of the death penalty on people of color in San Bernardino County. The RJA proceeding may thus generate discovery disputes and attendant delays. In short, a limited remand to pursue RJA claims in the trial court is not likely to be practically very limited.

We recognize that Wilson is willing to tolerate — indeed, perhaps may favor — delaying the final resolution of his appeal while he litigates his RJA claims in superior court. But we must also consider the interests of victims' families, witnesses, and the public as well. (E.g., Cal. Const., art. I, § 28, subd. (b)(9) [crime victims are entitled to "a prompt and final conclusion of the case and any related post-judgment proceedings"].) Consideration of these interests counsels against further delaying the resolution of Wilson's appeal when he has not demonstrated that it is necessary to do so.

Wilson also invokes judicial economy, noting that success on his RJA claims could moot some or all the issues raised on direct appeal. As a general matter, of course, the reverse is also true, that success on a direct appeal could render RJA proceedings unnecessary. And as just described, RJA proceedings, with an appropriate showing, may require protracted discovery, other difficulties in obtaining and presenting evidence, and an evidentiary hearing potentially broad in scope. Under the circumstances, considerations of

judicial economy do not persuade us that a stay and remand is warranted.

### 3. Conclusion

Ultimately, Wilson has not demonstrated that he faces legal or practical obstacles to pursuing RJA relief in superior court that would be avoided by staying adjudication and final resolution of the claims he has raised on direct appeal and remanding his case to initiate RJA proceedings. As such, Wilson has not established good cause for us to depart from our usual practice of adjudicating what we can based on the record before us and deferring matters that require substantial factual development for presentation through a petition for a writ of habeas corpus.

The concurrent jurisdiction afforded to habeas corpus petitions raising RJA claims, the opportunity, after the appointment of full-scope capital habeas counsel, to raise non-RJA claims challenging a death judgment without a successive procedural bar, and OSPD's ability and willingness to develop and present Wilson's RJA extrarecord claims, all mean that this usual practice will not prevent Wilson from seeking prompt relief for violations of the RJA or undermine the Legislature's clearly expressed urgency to remedy racial discrimination in the criminal justice system. A stay and limited remand, or a remand without a stay, are not necessary in these circumstances to ensure efficient and effective access to RJA proceedings. We therefore deny Wilson's motion for a stay of his appeal and limited remand to pursue extrarecord RJA claims and deny his alternate request of a remand without a stay.

We emphasize that our holding today is limited. In concluding that the RJA does not automatically authorize a stay

113

and remand in all pending criminal appeals in which colorable RJA claims may be raised on evidence that has not yet been developed, we do not suggest that a stay and remand is categorically unavailable. We recognize that it may be necessary to employ the procedure in some cases to permit the timely and effective development of extrarecord RJA claims in superior court. The determination whether there is good cause for a stay and remand will depend on the circumstances of the case at hand. In resolving Wilson's motion, we have addressed the concerns he has raised that relate to his own case; we do not reach other issues or concerns not presently before us.[23]

---

[23] We also have no occasion here to provide an exhaustive catalog of other considerations that may be relevant in subsequent cases. For purposes of future guidance, however, we note that the analysis will likely be different in cases unlike this one, in which the RJA claims are intertwined with issues on appeal. In such cases, appellants lose the option of pursuing them concurrently in a habeas petition. (*In re Carpenter, supra,* 9 Cal.4th at p. 646.) The utility of a stay and remand in such cases accordingly may be greater. In those circumstances, the stay-and-remand procedure could alleviate significant delay — particularly in capital cases at an early stage of appellate proceedings — by making it unnecessary to wait for conclusion of the appeal before pursuing RJA claims. The analysis may also be different in noncapital cases in which the claimed RJA violations carry the possibility of release, and cases in which delay may jeopardize the preservation of evidence needed to make out an RJA violation.

## DISPOSITION

The judgment is affirmed.  The motion for a stay and limited remand is denied.


**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. WILSON

S118775


Dissenting Opinion by Justice Evans


Ironically — in the first case in which this court addresses the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317) — the majority effectively deprives capital litigants of access to the procedure it expressly provides for seeking timely relief.  A central reason the Legislature enacted the RJA was that "[c]urrent law, as interpreted by the courts, stands in sharp contrast to [the] Legislature's commitment to 'ameliorate bias-based injustice in the courtroom,'" with "[c]urrent legal precedent often result[ing] in courts sanctioning racism in criminal trials."  (Stats. 2020, ch. 317, § 2, subds. (g), (d).)  The majority supplants the Legislature's demand to swiftly rid the criminal justice system of racism with a novel and unnecessary RJA-specific habeas path that, as the Legislature was well aware, is riddled with delay because of the difficulty of appointing habeas counsel and processing capital habeas claims.  As explained below, this approach is untethered to the statute's text or legislative history, and undermines the Legislature's stated purpose.

Javance Mickey Wilson was convicted in 2002 of murder and robbery of Andres Dominguez; murder and attempted robbery of Victor Henderson; and robbery, carjacking, and attempted murder of James R.  His second jury sentenced him to death.  In 2020, the Legislature enacted the RJA, requiring the remediation of racism in all its forms in our criminal justice system.  In March 2023, Wilson filed a motion in this court

1

requesting that we stay his appeal and remand the matter to superior court for litigation of two claims under the RJA: one claim based on a juror telling other jurors during penalty phase deliberations that the severe childhood abuse and neglect Wilson endured was "cultural" and typical in African American families; and the other alleging racial disparities in charging and sentencing practices in capital cases in San Bernardino County.

The question is whether Wilson has established good cause for a stay and remand under the RJA. I would hold that he has. The Legislature created an express stay-and-remand mechanism for appellate defendants to litigate their RJA claims. (Pen. Code, § 745, subd. (b) (section 745(b)).)[1] Since Wilson sets forth nonfrivolous RJA claims that require further factual development, he has established good cause for a stay and remand under the RJA. Even if the good cause standard of section 1260 applies, as the majority concludes, Wilson has demonstrated a stay and remand is needed because it *is* "just under the circumstances." The Legislature said as much. Leaving the concerns about procedural bars aside — some of which the majority addresses — the fact that a capital defendant could technically pursue a limited-scope RJA habeas claim at any time during their appeal or upon its finality fails to account for serious practical obstacles and does not justify overriding legislative intent. Thus, I would grant Wilson's request for a stay and remand — or in the very least, grant his request for a conditional affirmance of the judgment and a

---

[1]    All further unspecified statutory references are to the Penal Code.

limited remand — to pursue his RJA claims.  With respect, I dissent.

## I.

### *The California Racial Justice Act & Its Stay-and-Remand Mechanism*

In enacting the RJA, the Legislature declared:  "We cannot simply accept the stark reality that race pervades our system of justice.  Rather, we must acknowledge and seek to remedy that reality and create a fair system of justice that upholds our democratic ideals."  (Stats. 2020, ch. 317, § 2, subd. (b).)  The Legislature sought to address the "deleterious effect" racial bias has "on our system of justice as a whole," that "undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law." (*Id.*, § 2, subd. (a).)  It observed that "[e]ven though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms."  (*Id.*, § 2, subd. (c).)   The Legislature squarely rejected "[e]xisting precedent" that not only "tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials" but also "accepts racial disparities in our criminal justice system as inevitable."  (*Id.*, § 2, subds. (e), (f).) It rejected the legal doctrines that have been used to bar relief, deeming them improperly animated by " 'a fear of too much justice.' "  (*Id.*, § 2, subd. (f), quoting *McCleskey v. Kemp* (1987) 481 U.S. 279, 339 (dis. opn. of Brennan, J.).)  In embarking on a different path, the Legislature announced its "intent . . . to eliminate racial bias from California's criminal justice system" and "remedy the harm to the defendant's case and to the

3

integrity of the judicial system" so as "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).)

The Legislature's intent "to actively work to eradicate" racial disparities in the criminal justice system (Stats. 2020, ch. 317, § 2, subd. (i)) was subsequently extended in 2022 to existing judgments (Stats. 2022, ch. 739, § 1), putting those under a judgment of death at the front of the line. (See § 745, subd. (j)(2).) The Legislature deemed it " 'imperative that we afford a mechanism for retroactive relief so our criminal justice system can begin to reckon with systemic racism and correct past injustices.' " (Assem. Conc. in Sen. Amends. to Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Aug. 24, 2022, p. 4.) Defendants had been waiting far " 'too long' " for this relief. (*Ibid.*) Indeed, " '[t]hose with prior, racially biased convictions and sentences deserve equal justice under the law and *have waited*.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 256 (2021–2022 Reg. Sess.) as amended Aug. 24, 2022, p. 12, italics added.)

Last year, the Legislature added the stay-and-remand provision to section 745(b). Specifically, the RJA was amended to provide a defendant "may . . . move to stay the appeal and request remand to the superior court." (§ 745(b).) The Legislature added the stay-and-remand provision to section 745(b) " 'to ensure that the basic civil rights protections provided by the RJA can be accessed in an efficient and effective manner.' " (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 6; see also Assem. Conc. in Sen. Amends., Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 1 [" 'to ensure RJA claims are processed more efficiently and that the

intent of the law is followed' "].) According to the Legislature, "[t]his stay and remand procedure was designed 'to permit the trial court to rule on the claim in the first instance, and to allow the parties to fully litigate the issue.' [Citations.] Therefore, it appears the Legislature intended the stay and remand procedure to be available in cases that need further factual development." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 817.)

The Legislature deemed the stay-and-remand mechanism "particularly important for individuals with death sentences," since these individuals — like Wilson — are "unlikely to have habeas attorneys assigned to them due to the unavailability of qualified counsel, making it nearly impossible to litigate their RJA claims in a timely fashion." (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 6.) For capital defendants, access to these remedies is a matter of life or death. (§ 745, subd. (e)(3).)

## II.

*Wilson Has Demonstrated Good Cause Pursuant to the RJA's Stay-and-Remand Procedure*

The stay-and-remand procedure in section 745(b) authorizes a remand to the superior court for RJA proceedings. By including an express provision, section 745(b) itself provides the " ' " 'established procedural rule' " ' " for stay requests under the RJA. (*People v. Awad* (2015) 238 Cal.App.4th 215, 222 (*Awad*).) Since section 745(b)'s stay-and-remand provision establishes an independent source of authority, we need not look beyond the section for such authority.

In contrast, for example, Proposition 47 (the Safe Neighborhoods and Schools Act), which reduced certain

nonviolent property crimes and drug offenses to misdemeanors, did not contain an express stay-and-remand provision. (See § 1170.18; maj. opn., *ante*, at pp. 92–94.) Unlike the RJA, nothing in the terms of Proposition 47 vested authority in the appellate courts to stay and remand a matter to apply the ameliorative benefits of the initiative. Accordingly, courts necessarily looked to section 1260 to fill in the gap. Specifically, courts "construe[d] Proposition 47 together with section 1260 to authorize a limited remand to the trial court to hear a postconviction motion to recall a sentence under section 1170.18." (*Awad, supra,* 238 Cal.App.4th at p. 222.) Similarly, courts have acknowledged that reviewing courts can order a stay and limited remand pursuant to section 1260 to allow the superior court to rule on a petition invoking the benefits of Senate Bill No. 1437 (2017–2018 Reg. Sess.), which also does not contain an express stay-and-remand provision. (See *People v. Martinez* (2019) 31 Cal.App.5th 719, 729, citing *Awad,* at p. 222; *People v. Cervantes* (2020) 46 Cal.App.5th 213, 226 [same]; see also § 1172.6 [formerly § 1170.95].)

When the Legislature added the stay-and-remand procedure to the RJA, it did not state whether a showing of good cause is required, nor define what constitutes good cause under that provision. The language of section 745(b) — that a defendant "*may* . . . move to stay the appeal and *request* remand to the superior court" (italics added) — suggests that a stay and remand is not automatic upon request and that there must be some cause to stay a pending appeal and remand the matter. The question remains what constitutes good cause under section 745(b).

Based on the legislative history related to section 745(b), defendants in Wilson's position — who have viable RJA claims

requiring further factual development — have shown good cause for a stay and remand to efficiently litigate their RJA claims. The RJA is a remedial statute, and we must construe it liberally to promote its protective purpose. (See *Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 532.) That purpose is to rid the criminal justice system of the scourge of racism *as efficiently and effectively as possible.* The Legislature created the stay-and-remand procedure to afford defendants the swift opportunity to engage in further factual development of their RJA claims. In contrast, the habeas provision of section 1473, subdivision (e) exists for defendants whose appeal is final, for defendants whose RJA claims need no further factual development, and for defendants who elect not to request a stay and remand for whatever reason (e.g., so their appellate claims will be addressed first or for noncapital defendants who want to have counsel pursuant to an RJA-qualified appointment). Where a defendant presents a nonfrivolous RJA claim requiring factual development and elects to utilize the stay-and-remand mechanism, good cause has been shown. Since Wilson has done just that, I would grant his request.

## III.

### *Even If Section 1260's Cause Standard Applies, Wilson Has Demonstrated Good Cause Under That Standard*

The majority writes the RJA's stay-and-remand mechanism out of the statute and supplants it with section 1260's good cause standard. Section 1260 generally confers authority on appellate courts to "remand the cause to the trial court for such further proceedings as may be just under the circumstances." Viewing section 745(b) as if it contains no stay-and-remand provision would render its stay-and-remand

procedure mere surplusage, which we must avoid. (See *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 828.) Had the Legislature intended section 1260 to apply, there would have been no need to include a separate stay-and-remand provision in section 745(b). It could have simply referred to section 1260 or not said anything at all about the stay-and-remand mechanism.

Even if section 1260's cause showing applies, the inquiry is whether a stay of the appeal and remand for further proceedings are "just under the circumstances." What is "just under the circumstances" necessarily depends on the specific circumstances of the case and context. The term "good cause" can mean different things in different contexts. (See, e.g., *Laraway v. Sutro & Co.* (2002) 96 Cal.App.4th 266, 274; *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 158 [" ' "[t]he term 'good cause' is not susceptible of precise definition." ' [Citation.] This chameleon-like phrase takes on different meanings in different contexts"].) When evaluating what good cause means "in a particular context, . . . courts utilize common sense based upon the totality of the circumstances. Those circumstances include the purpose of the underlying statutory scheme." (*Laraway*, at p. 274.)

The Legislature designed section 745(b)'s stay-and-remand mechanism with the singular aim that viable RJA claims be processed efficiently and effectively — to ensure defendants are not relegated to waiting for equal justice under the law. Here, Wilson presents two plausible RJA claims. Success on either claim would make Wilson ineligible for the death penalty. (§ 745, subd. (e)(3).) This fact weighs heavily in favor of granting a stay and remand under section 745(b). He also has shown that remanding the matter to the trial court

before deciding the appeal is likely to result in a (much) more expeditious resolution of his RJA claims than subjecting him to the habeas quandary. As the Attorney General recognizes, the RJA was intended to facilitate pursuit of RJA claims "as quickly as possible." With a stay and remand under the RJA, Wilson would have access to counsel under the purview of his current counsel's appellate appointment. In contrast, as Wilson astutely notes, "the mechanism for appointment of counsel to represent a capital client in habeas corpus proceedings limited to RJA issues is, at best, unclear." Thus, Wilson has demonstrated a stay and remand are "just under the circumstances" (§ 1260) and shown good cause.

In evaluating what is "just under the circumstances" (§ 1260), the majority crafts a balancing test for good cause without any textual support in the RJA or its legislative history. The majority requires defendants seeking a stay and remand to prove there are "practical reasons in a particular case why the usual appellate process must be altered to ensure timely and effective access to RJA remedies." (Maj. opn., *ante*, at p. 84; see also *id.* at p. 99 ["a court must consider whether there are unusual circumstances that give rise to pressing concerns warranting a departure from the usual conduct of an appeal"].) Neither this proposed test nor the majority's application of it to Wilson's case complies with the RJA's mandate: to expeditiously vindicate a defendant's rights under the RJA. Contrary to the Legislature's policy choice, the majority favors expeditious resolution of Wilson's appellate claims over all else. Such favoring "stands in sharp contrast to th[e] Legislature's commitment to 'ameliorate bias-based injustice in the courtroom' " and the judicial "sanctioning [of] racism in criminal trials." (Stats. 2020, ch. 317, § 2, subds. (d), (g).)

The prospect that proceedings to vindicate rights under the RJA may be "potentially quite involved" (maj. opn., *ante*, at p. 111) was known to the Legislature at the time it enacted the stay-and-remand procedure. Yet the Legislature nonetheless believed the stay-and-remand mechanism was "particularly important" for capital defendants like Wilson, given the high stakes and the time these defendants have been waiting to vindicate their rights.

The RJA is different from the statutes at issue in the cases relied upon by the majority. Those cases demonstrate there is a different calibration for good cause in the context of the RJA favoring a stay and remand here. As noted above, the statutes at issue in the cases cited by the majority do not contain express stay-and-remand provisions as the RJA does — much less one included for the explicit purpose of efficiently and effectively resolving claims brought under the statute. In the RJA, the Legislature has included a specific stay-and-remand procedure and prioritized swift resolution of viable claims over possible delay in the finality of appeals. Additionally, unlike the RJA, the statutes at issue in the cases relied upon by the majority did not involve basic civil rights protections. It would be a category error to analogize the stay-and-remand procedure here — which facilitates the RJA's anti-discrimination purpose — to the stay-and-remand procedure for recent sentencing reform measures, which were enacted merely as "an act of grace and mercy." (*People v. Vance* (2023) 94 Cal.App.5th 706, 716.)

As emphasized by the Legislature, the fact that Wilson is a capital defendant carries particular significance and weight in the good cause assessment. When the Legislature extended the RJA to all defendants, it stated that that these remedies are to be expeditious, efficient, and effective. But as to capital

defendants, in particular, the Legislature instituted the stay-and-remand procedure to avoid the extended delays in capital appointments. (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1118, *supra*, as amended May 18, 2023, p. 6.) The Legislature was responding to and accounting for the significant and serious obstacles capital defendants face in securing qualified counsel. It specifically recognized the existence of troubling delays in the appointment of qualified capital habeas counsel notwithstanding the existing appointment provision of section 1473, subdivision (e). While the Legislature viewed section 1473, subdivision (e) inadequate for addressing RJA claims, the majority considers it sufficient. (See maj. opn., *ante*, at pp. 106, 110–111.) Despite the majority's recognition that we must consider "practical reasons" (maj. opn., *ante*, at p. 84) why a stay and remand may be needed to ensure timely and effective access to RJA remedies, it discounts the practical circumstances to which the Legislature was responding.

It is well known, especially to this court, that there is a dearth of qualified counsel and funding for capital appointments. There are yearslong delays in the appointment of counsel for direct appeals and habeas corpus petitions, and those delays are particularly protracted in the appointment of habeas counsel. (Cal. Com. on the Fair Admin. of Justice, Final Report (2008) p. 114 (Commission Report) ["The system is plagued with excessive delay in the appointments of counsel for direct appeals and habeas corpus petitions"].) "On average in California, it takes three to five years after a death judgment to appoint appellate counsel. [Citation.] In April 2016, there were 49 capital defendants waiting for attorneys to be appointed for direct appeals and 360 capital defendants waiting for attorneys to be appointed for habeas corpus petitions. [Citation.] About

half of those waiting for appointment of habeas corpus counsel have been waiting for over 10 years. [Citation.]" (*Briggs v. Brown* (2017) 3 Cal.5th 808, 864 (conc. opn. of Liu, J.) (*Briggs*); see *People v. Potts* (2019) 6 Cal.5th 1012, 1062–1067 (conc. opn. of Liu, J.) (*Potts*).) "On average, it takes 20 years for state habeas counsel to be appointed after someone is sentenced to death. There are 363 death-sentenced people awaiting initial appointment of counsel for state habeas litigation, more than half of all people sentenced to death in California. Eighty-five people on death row have been waiting for appointment of habeas counsel for more than 20 years." (Com. on Revision of the Pen. Code, Death Penalty Report (Nov. 2021) p. 32 (Death Penalty Report) <http://www.clrc.ca.gov/CRPC/Pub/Reports/CRPC_DPR.pdf> [as of Aug. 5, 2024]; see also Habeas Corpus Resource Center (HCRC), Annual Report (2023) p. 19 (HCRC Report) ["In total, there are 410 people awaiting the appointment of habeas corpus counsel in the California courts"] <http://www.hcrc.ca.gov/documents/HCRC%20Annual%20Report%202023.pdf> [as of Aug. 5, 2024]; all Internet citations in this opinion are archived by year, docket number and case name at <http:// www.courts.ca.gov/38324.htm>.)

Much of the delay in appointing capital counsel has been attributed to a lack of qualified counsel and funding. (Death Penalty Report, *supra,* at p. 32 ["The main reason for these delays [in capital proceedings] is a lack of qualified attorneys to handle state habeas corpus proceedings"]; HCRC Report, *supra,* at p. 23 [noting the attribution of the backlog to "the acute shortage of qualified, competent attorneys willing and able to accept appointments in habeas corpus proceedings"].) "The California death penalty costs the state approximately $150 million per year. Even with those costs, the state is not spending

enough money: people sentenced to death routinely wait decades to be assigned post-conviction lawyers because the state does not pay for more attorneys." (Death Penalty Report, *supra*, at p. 31; see Commission Report, *supra*, at pp. 132–135 [as part of the commission's recommendation for the State to commit to an annual investment of at least $95 million dollars per year, the commission recommended a 500 percent increase in HCRC's budget and a 33 percent increase in the Office of the State Public Defender's budget to address the unavailability of capital counsel]; Death Penalty Information Center, *NEW VOICES: California's New Chief Justice Calls Death Penalty System Ineffective* (Dec. 27, 2011) <https://deathpenaltyinfo.org/news/ new-voices-californias-new-chief-justice-calls-death-penalty- system-ineffective> [as of Aug. 5, 2024] [quoting former Chief Justice Tani Cantil-Sakauye's statement that the death penalty system needs "structural change, and we don't have the money to create the kind of change that is needed"]; see also *Potts*, *supra*, 6 Cal.5th at pp. 1062–1067 (conc. opn. of Liu, J.); *Briggs*, *supra*, 3 Cal.5th at pp. 864–865 (conc. opn. of Liu, J.).)

There is no indication that these barriers to accessing qualified capital counsel and funding disappear in the context of a limited-scope habeas appointment for a capital defendant. (See Death Penalty Report, *supra*, at p. 31 ["The Judicial Council of California recently estimated and sought additional annual funding of more than $18 million to cover Proposition 66 costs. This funding request was not granted"]; *id.* at p. 32 ["by requiring that Superior Courts process habeas cases in the first instance, Proposition 66 created an additional level of review: either side may appeal the habeas decision of the Superior Court and new counsel must then be appointed in the Court of Appeals"]; HCRC Report, *supra*, at p. 19 ["the courts have

generally stayed habeas corpus appeals because no competent authority has indicated the funds from which appellate counsel in habeas corpus proceedings will be compensated or the rate at which counsel will be compensated. Some superior courts have taken the same approach"].) In enacting the RJA's stay-and-remand provision, the Legislature assumed these obstacles persist and we have no reason otherwise to question its judgment. (But see maj. opn., *ante*, at pp. 105–111.) Nonetheless, the majority effectively has set a policy regarding capital habeas-related appointments and assumes — without any basis — that the funding needed to implement this policy is available or will somehow materialize.

The majority also fails to explain why a limited-scope RJA capital habeas appointment does not require compliance with California Rules of Court qualifications. (§ 1473.1 ["Appointment standards for counsel where an individual has been sentenced to death *shall* be consistent with existing standards set forth in the California Rules of Court" (italics added)].) California Rules of Court, rule 8.652(a) "defines the minimum qualifications for attorneys to be appointed by a court to represent a person in a habeas corpus proceeding related to a sentence of death." California Rules of Court, rule 8.605(f), defining minimum qualifications for capital appellate case appointments, incorporates rule 8.652 requirements for appointments of appellate counsel in death penalty-related habeas corpus proceedings. It appears that, since limited-scope RJA capital habeas is a death penalty-related habeas corpus proceeding, the appointment standards set forth in California Rules of Court, rule 8.652 would apply to limited-scope habeas appointments. The majority does not explain why this is not the case.

The majority next fails to address whether superior courts can prioritize appointing capital habeas counsel for RJA proceedings over appointing capital habeas counsel for the oldest judgments of death. California Rules of Court, rule 4.561, establishes the mechanism for superior courts to appoint counsel "in death penalty-related habeas corpus proceedings" and requires, as a matter of equity, that superior courts prioritize capital habeas appointments for the oldest judgments of death. (Cal. Rules of Court, rule 4.561; see also *id.*, rule 4.561(e)(1), (2) [noting superior court must make "the findings required by Government Code section 68662" for appointments in death penalty-related habeas corpus proceedings and appointments must be "from the statewide panel of counsel compiled under rule 4.562(d)(4)"].) Thus, limited-scope RJA habeas appointments may suffer from the same practical realities and profound barriers that pervade capital appointments generally. (See Death Penalty Report, p. 31 [due to the financial costs and delays of capital proceedings, the former Chief Justice Ronald George "diagnosed California's system as 'dysfunctional' and called it a 'charade' "].) The majority's failure to explain which rules for appointment do and do not apply is particularly troubling given that both the Legislature and the Advisory Committee to the Judicial Council appear to assume that existing capital habeas qualifications *do* apply to RJA habeas appointment in capital cases. (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended May 18, 2023, p. 6 [deeming the stay-and-remand mechanism "particularly important for individuals with death sentences," since these individuals are "unlikely to have habeas attorneys assigned to them due to the unavailability of qualified counsel, making it nearly impossible

to litigate their RJA claims in a timely fashion"]; Judicial Council of Cal., Criminal Law Advisory Com., Invitation to Comment, W24-02 (2024) Criminal Procedure: Appointment of Counsel for Claims Filed Under Penal Code Section 1473(f), p. 4 [electing to not develop RJA qualifications in capital cases, "given that qualifications for counsel in death penalty habeas proceedings are quite extensive and already difficult to meet"] <https://www.courts.ca.gov/documents/w24-02.pdf> [as of Aug. 5, 2024].) With today's opinion, superior courts have no clear guidance from this court as to whether any particular court-appointed capital appellate counsel will meet the RJA capital habeas qualifications. All that superior courts will know is that "Wilson's counsel . . . indisputably meet[s] them." (Maj. opn., *ante*, at p. 110.)

Rather than addressing the Legislature's concerns about capital defendants accessing qualified counsel, the majority assumes staying the appellate proceedings is unnecessary by relying on the fact that Wilson is represented by the Office of the State Public Defender (OSPD) on appeal. The majority explains capital defendants can pursue their RJA claims in a habeas proceeding separately from their comprehensive habeas petition (without tripping any future successiveness bars) and posits that Wilson's appellate counsel can represent him in that limited-scope RJA only habeas proceeding. I have no reason to doubt that OSPD would meet the qualifications for such an appointment under the California Rules of Court, and OSPD has given no indication otherwise. But there are several readily apparent reasons the majority's reliance on OSPD's ability to represent Wilson in a limited-purpose RJA is misguided.

In Wilson's case, there undoubtedly will be obstacles and attendant delays for OSPD to be appointed in this limited

capacity by the superior court. (See Death Penalty Report, *supra*, at p. 32 ["under Proposition 66, Superior Courts are now in charge of appointing habeas counsel instead of the California Supreme Court. But no new habeas cases have been assigned since the passage of Proposition 66 and only three new attorneys have been included in the pool of qualified capital habeas counsel"].) In addition to lack of funding, experts have expressed concern that "many Superior Courts are not familiar with state habeas corpus law" and anticipate "it will likely take longer for Superior Courts to adjudicate capital habeas claims." (*Id*. at p. 33.)

HCRC reports that, as of 2023, it has only been appointed by the superior court in one case, and other than HCRC, only "four attorneys licensed to practice in California are qualified under the California Rules of Court to represent petitioners in their habeas corpus proceedings." (HCRC Report, *supra*, at p. 19, citing Cal. Rules of Court, rule 4.652; see HCRC Report, at p. 34 ["Proposition 66 has ground state habeas appointments nearly to a halt. Just one of the over 360 people who were awaiting the appointment of habeas corpus counsel for their initial state habeas proceedings at the time Proposition 66 became effective have been appointed counsel"].)

Even if we were to assume these obstacles are surmountable — that enough funding is available and the delays in appointment of RJA-limited habeas counsel are relatively marginal in comparison to the delays in capital proceedings — Wilson's appeal will soon be final, at which point OSPD's capital appellate appointment will end. With OSPD's appellate appointment ending, Wilson will become what is known as a *Morgan* petitioner (*In re Morgan* (2010) 50 Cal.4th 932): a capital defendant whose appeal is final and is awaiting

appointment of state habeas counsel. The California Appellate Project (CAP), who assists *Morgan* petitioners for the limited purpose of ensuring future habeas claims are properly preserved, reports in its amicus curiae letter that there are roughly 140 of these capital defendants. As OSPD is appointed counsel in roughly half of capital appeals with counsel, we can deduce that roughly half of the *Morgan* petitioners were OSPD's former clients on appeal.

In relying on OSPD to represent Wilson in an RJA-limited habeas proceeding that "is not likely to be practically very limited" (maj. opn., *ante*, at p. 112), the majority effectively charges OSPD with a Herculean task: to provide representation in RJA habeas proceedings to its current capital appellate clients *and* its former clients who are awaiting appointment of capital habeas counsel for their comprehensive habeas petition, *while simultaneously providing vigorous, timely, and efficient representation in their clients' capital appeals.* It is possible, I suppose, that CAP could assist *Morgan* petitioners in this RJA habeas appointment vacuum too. But charging OSPD with the aforementioned appointments and attendant professional responsibilities and obligations demands a significant financial investment in staffing and resources for capital appointments and proceedings — an investment that has been repeatedly called for but never made. (See, e.g., HCRC Report, *supra*, at p. 24 [noting HCRC's recent request to fund 70 new positions was denied].)

In addition, the majority fails to appreciate that half of capital appellate appointments are court-appointed private counsel, not OSPD. CAP, who provides support to court-appointed, private capital appellate counsel in roughly 140 of the 220 capital cases with direct appeal appointments, raises

serious questions as to whether those appellate attorneys can satisfy the appointment requirements in order to represent their clients in a limited-purpose habeas petition under section 1473, subdivision (e). It is possible that those court-appointed private counsel who do not qualify for capital habeas appointments (see Cal. Rules of Court, rule 8.652), may be able to associate with counsel who would qualify (see Cal. Rules of Court, rule 8.605(f)), which presumably includes CAP. But, again, given the appointment delays and funding issues in capital proceedings, we cannot rely on CAP to perform that Herculean task either, without a significant ongoing investment in its staffing and resources. Instead of CAP filling in that vacuum, it is more likely that the difference in court-appointed private counsel and public counsel will contribute to a two-tiered system between capital defendants with court-appointed public counsel and those with court-appointed private counsel — one that may violate the equal protection rights of capital petitioners. (See, e.g., *Jones v. Chappell* (C.D.Cal. 2014) 31 F.Supp.3d 1050, 1057–1058, revd. *sub nom. Jones v. Davis* (9th Cir. 2015) 806 F.3d 538 [petitioner's claim was procedurally barred].)

This court is responsible for paying court-appointed private capital counsel for RJA related work under section 745 and 1473, subdivision (f), with the $2.15 million provided to us by the Legislature as part of the Budget Act of 2023. (Assem. Bill No. 102 (2023–2024 Reg. Sess.); Stats. 2023, ch. 38, § 1, eff. July 10, 2023; see also *ibid.* [$500,000 available to the California Supreme Court to contract with CAP on RJA related work pursuant to sections 745 and 1473, subd. (f), to "supplement" existing funding].) These funds were allocated for capital counsel to develop and litigate RJA claims. (See Assem. Bill No. 102, *supra*, § 1 [funds are to be spent on "experts, investigators,

paralegals, or other ancillary needs" in order "to provide assistance in capital cases regarding potential or actual claims"]; see also *id.*, § 231 [$3.1 million to OSPD for RJA related work in capital cases for similar expenses].) I doubt the Legislature intended this court and capital counsel to waste the funds on court-created procedural hurdles, such as the one the majority creates with its opinion today. While it appears the funding is sufficient to pay court-appointed private capital counsel for work related to RJA proceedings at this time, the funding will expire in June 2026, at which time the funding source for paying court-appointed private capital counsel is unclear. (See Assem. Bill No. 102, *supra*, § 1 ["These funds shall be available for encumbrance or expenditure until June 30, 2026"].) Since the majority's departure from the straightforward mechanism the Legislature provided will likely result in significant delays in disposing of stay and remand requests, capital defendants may not be able to litigate the merits of their RJA claims until after the funds allocated for this purpose have expired.

The majority claims Wilson has not shown "he faces legal or practical obstacles" (maj. opn., *ante*, at p. 113) in accessing RJA relief pursuant to a habeas petition. But Wilson *did* present a significant and documented obstacle in his letter following oral argument: that "the appointment of capital counsel to represent a capital client in habeas proceedings has essentially ground to a halt." It is unclear how Wilson (or others) will overcome this reality or how they could satisfy the majority's newly articulated burden of proving what "legal or practical obstacles" they may face. Today's opinion places Wilson and future litigants in an absurd predicament — one that the Legislature by its own words did not intend and indeed

sought to avoid. Prior to seeking a stay and remand, was Wilson expected to predict that his motion before this court would be futile and thus seek appointment in the superior court — in the very forum where appointments have "ground to a halt" — so he could report to the court about the delays he personally experienced? The majority faults Wilson for failing to anticipate various other "concrete obstacles" (maj. opn., *ante*, at p. 111, fn. 22) that today's decision erects and dismisses the serious practical considerations already raised by Wilson and amici curiae — and undisputed by the Attorney General — as "beyond the scope of [its] decision." (*Id.*, at p. 110, fn. 21.) But cabining these obstacles does not vanish them.

The majority's approach injects delay, avoids addressing the issue of counsel qualification requirements, and does not utilize earmarked funding allocated to this court and capital counsel for RJA related work. Most troubling, it allows for the affirmance of death sentences even where nonfrivolous claims have been raised about racial bias that, if proven, would require vacating the conviction and sentence and prohibit the prosecution from seeking death. It does not make sense from a judicial economy perspective to affirm an appeal in such instances and is not what the Legislature contemplated when it included an express stay-and-remand provision in the RJA. Instead, the stay-and-remand procedure provides a clear, prompt, and efficient means of evaluating claims of racial bias. Additionally, a stay and remand could effectively take cases out of the overburdened, automatic capital appeal pipeline. In cases like Wilson's where such claims can be addressed within the scope of his appeal, it makes sense to do so before an appeal is final where possible.

The majority suggests "further delaying the resolution of Wilson's appeal" is against "the interests of victims' families, witnesses, and the public." (Maj. opn., *ante*, at p. 112, citing Cal. Const., art. I, § 28, subd. (b)(9).) This is an unduly narrow understanding of the societal and victims' interests at stake. Article I, section 28 of the California Constitution provides that crime victims are entitled to "a prompt and final conclusion of the case *and* any related postjudgment proceedings." (*Id.*, subd. (b)(9), italics added; see also *id.*, subd. (b)(6).) It is not solely focused on the resolution of an automatic appeal, but on postjudgment proceedings generally. As explained, the majority injects additional delay into the resolution of post-judgment RJA proceedings by relegating capital defendants to litigate their RJA claims on habeas when those claims would be resolved more promptly on appeal. Put simply, the majority's novel RJA habeas path does not advance victims' interests in prompt resolution of capital proceedings.

What's more, the RJA seeks to vindicate the interests of *all* Californians in having a criminal justice system free of racial bias. (See Stats 2020, ch. 317, § 2, subd. (a) [racism in the system "undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law"].) The stay-and-remand mechanism was designed to accelerate the achievement of that goal, not to accelerate the processing of automatic appeals in cases that plausibly may be tainted by racial bias. As we have previously recognized, Californians value the interest of fairness above expediency (*Briggs, supra*, 3 Cal.5th at p. 860) and understand "a court's fundamental and overriding obligation to administer the proceedings that are pending before it in a manner that is

22

consistent with the ends of justice." (*People v. Engram* (2010) 50 Cal.4th 1131, 1151.)

Lastly, in denying Wilson's stay and remand request, the majority states there will be no successiveness bars for capital defendants who bring a limited-scope RJA habeas petition separately from a comprehensive habeas petition. (Maj. opn., *ante*, at pp. 84, 86, 101–104, 106–108.) I appreciate the majority's commitment to ensuring it hasn't laid procedural traps for Wilson, as well as its guidance for future RJA capital litigants. Nevertheless, the majority's analysis raises more questions than it answers. For instance, if OSPD litigates certain RJA claims for select current and former clients by way of a habeas petition, will subsequent habeas counsel be barred from litigating any additional RJA claims it identifies? Will this court more promptly address future requests for a stay and remand so that capital appellate defendants who are forced to initiate habeas proceedings may do so in a timely fashion? Will the Attorney General appreciate the majority's example of "intertwined" RJA claims (see maj. opn., *ante*, at p. 114, fn. 23) as ones more suitable than Wilson's for a stay and remand, or will he argue that remanding "intertwined" claims for further factual development provides defendants an impermissible second bite of the apple? Can a capital defendant ever show good cause for a stay and remand, since the majority views RJA proceedings as "not likely to be practically very limited" and an obstacle to the resolution of a capital defendant's appeal? (Maj. opn., *ante*, at p. 112.) While the majority's assurance it has not obliterated the RJA's stay-and-remand procedure may have initial appeal, its approach has created an unnecessary procedural maze for Wilson and future litigants.

There is a certain irony in the majority's suggestion that judicial economy does not support Wilson's request when today's opinion, by its own terms, opens a new field of case-by-case jurisprudence on what constitutes "good cause" and what sorts of claims are sufficiently "intertwined" to warrant a stay and remand. (Maj. opn., *supra*, at p. 114, fn. 23 ["We also have no occasion here to provide an exhaustive catalog of other considerations that may be relevant in subsequent cases. For purposes of future guidance, however, we note that the analysis will likely be different in cases unlike this one, in which the RJA claims are intertwined with issues on appeal"].) None of this forthcoming litigation and totality-of-the-circumstances decisionmaking under section 1260 would be necessary if the court simply followed the Legislature's clear intent in enacting the RJA's stay-and-remand procedure.

One thing is clear: capital defendants on appeal who hope to have any chance of resolving their RJA claims in an efficient and expeditious manner should file their request for a stay and remand *as soon as practically possible* in the event they need to join the long line of those awaiting the appointment of habeas counsel. There may be a significant lapse in time between making the request and the court's ruling, during which time the queue for appointment of RJA habeas counsel may grow. And since the majority indicates that cause for cases farther along in the appellate pipeline is more difficult to demonstrate given the interests favoring resolution of the appeal (none of which were noted by the Legislature in enacting the stay-and-remand procedure), capital litigants may stand a better chance at having their request granted the sooner they make it.

In sum, OSPD and CAP cannot solve the lack-of-qualified-counsel conundrum of which the Legislature was rightfully

24

attuned. Given the remedial nature of the RJA, the Legislature's commitment to swift resolution of viable RJA claims, and its intent to avoid delay *associated with capital appointments*, Wilson has shown a stay and remand is "just under the circumstances." (§ 1260.) Thus, even if the cause standard of section 1260 applies, I would grant Wilson's request for a stay and remand — or, in the very least, grant his request for a conditional affirmance and limited remand, wherein we conditionally affirm his judgment and remand the matter for the superior court to conduct RJA proceedings.

\*      \*      \*

Today's opinion departs from the Legislature's demand to efficiently rid the criminal justice system of racism in all its forms. Despite the Legislature's clear and urgent call, it effectively deems those who may have racially biased convictions and death sentences as undeserving of swift access to equal justice under the law. The majority achieves an affirmance of Wilson's appeal at the cost of injecting needless additional delay into the death penalty system — bringing it even closer to collapse. (See Howe, *Can California Save Its Death Sentences? Will Californians Save the Expense?* (2012) 33 Cardozo L.Rev. 1451, 1452 [noting former Chief Justice Ronald George's warning that the death penalty system is at risk of " 'fall[ing] of its own weight' "]; Shafer, *California's Chief Justice: Hard to Say the Death Penalty Is Working* (Jan. 23, 2015) KQED [quoting former Chief Justice Tani Cantil-Sakauye's statement, "It's difficult to say it's working . . . . And there's no talk in the state Legislature of fixing it"].)

Now, the Legislature is left to act once again to address the injustices and inefficiencies it aimed to resolve in enacting

the RJA's stay-and-remand procedure. It can do so by clarifying what constitutes good cause for a stay and remand under section 745(b). Additionally, given the financial resources that will be required to litigate stay-and-remand requests following today's opinion, I urge the Legislature to continue committing funding for RJA related work, particularly in capital cases.

I respectfully dissent.

**EVANS, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Wilson

---

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S118775
**Date Filed:**  August 5, 2024

---

**Court:**  Superior
**County:**  San Bernardino
**Judge:**  James A. Edwards

---

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Jessica K. McGuire, Assistant State Public Defender, Christina Spaulding, Chief Deputy State Public Defender, Ellen J. Eggers and Craig Buckser, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James W. Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Meredith S. White and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Craig Buckser
Deputy State Public Defender
770 L. Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Christina Spaulding
Chief Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Donald W. Ostertag
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9557